**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CHURCHILL DOWNS INCORPORATED,

THE NEW YORK RACING
ASSOCIATION, INC.,

                Plaintiffs,

     v.

HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC.,

LISA LAZARUS,

CHARLES SCHEELER,

STEVE BESHEAR,

ADOLPHO BIRCH,

LEONARD S. COLEMAN, JR.,

JOSEPH DE FRANCIS,

TERRI MAZUR,

SUSAN STOVER,

BILL THOMASON,

D.G. VAN CLIEF,

THE UNITED STATES OF AMERICA,

FEDERAL TRADE COMMISSION,

LINA KHAN, in her official capacity as Chair
of the Federal Trade Commission,

REBECCA KELLY SLAUGHTER, in her
official capacity as Commissioner of the
Federal Trade Commission,

Civil Action No. ____3:24-cv-706-RGJ____

ALVARO BEDOYA, in his official capacity
as Commissioner of the Federal Trade
Commission,

MELISSA HOLYOAK, in her official capacity
as Commissioner of the Federal Trade
Commission,

ANDREW N. FERGUSON, in his official
capacity as Commissioner of the Federal Trade
Commission,

      Defendants.

## **COMPLAINT**

1.  Plaintiffs Churchill Downs Incorporated ("CDI") and The New York Racing Association, Inc. ("NYRA"), allege as follows:

2.  CDI and NYRA are pillars of the U.S. horseracing industry.  For 150 years, CDI has been conducting the world-famous Kentucky Derby beneath the iconic spires of Churchill Downs, and NYRA has been conducting the Belmont Stakes, the final race in the Triple Crown of Thoroughbred Racing.  Each year, CDI and NYRA conduct hundreds of horseraces at their racetracks in Kentucky, New York, and other States.  And countless members of the horseracing industry—horse owners, trainers, breeders, jockeys, and veterinarians—rely on the races conducted at CDI's and NYRA's tracks for their very livelihoods.

3.  Yet Defendant Horseracing Integrity and Safety Authority (the "Authority")—a private corporation that Congress vested with the power to develop and enforce a novel federal horseracing regulatory program—is threatening to prohibit CDI and NYRA from conducting *any* horseraces until they pay the Authority millions of dollars in illegally imposed fees.

4.  The Horseracing Integrity and Safety Act (the "Act") requires the Authority to determine each State's proportionate share of the annual fees necessary to fund its operations based

on (1) the Authority's budget for the following year; and (2) "the projected amount of covered racing starts for the year in each State." 15 U.S.C. § 3052(f)(1)(C)(ii). Yet the Authority unlawfully adopted—and the Federal Trade Commission unlawfully approved—an assessment methodology that imposes fees based largely on the size of a racetrack's purses, *i.e.*, the total prize money paid to race winners, rather than a State's share of racing starts. The only federal court to have considered the question held that the Authority's purse-based assessment methodology violates the Act. *Louisiana v. Horseracing Integrity & Safety Authority*, 617 F. Supp. 3d 478, 498 (W.D. La. 2022).

5.     CDI and NYRA declined to fund the Authority according to its unlawful purse-based assessment methodology and instead agreed to remit fees to the Authority pursuant to racing-start-based methodologies outlined in the Act. The Authority endorsed this arrangement for nearly two years, until its ever-increasing budget and fiscal mismanagement prompted it to change course and demand that CDI and NYRA immediately remit all fees due under the illegal purse-based methodology. When CDI and NYRA refused to accede to the Authority's unlawful demands, the Authority commenced enforcement actions against CDI and NYRA, threatening to prohibit them from conducting any horseraces until the fees due under the Authority's illegal assessment methodology are paid in full.

6.     Worse, the Authority is illegally conducting its enforcement action through an internal disciplinary process before its Board of Directors. The Act does not empower the private Authority to adjudicate fee-collection disputes in-house but rather envisions that the Authority would exercise its statutory power to bring a civil action in federal court to compel payment of any legitimate fee assessments. *See* 15 U.S.C. § 3054(j). Interpreting the Act to permit the Authority to determine for itself whether CDI and NYRA owe it millions of dollars and impose sanctions

based on its own findings would violate the Act and Article III of the Constitution, which require that such disputes between private entities be adjudicated in federal courts—not within administrative agencies and certainly not within private, unaccountable corporations.  And it would also violate the fundamental due-process principle that no person may serve as a judge in his own case.

7.     The Authority's assertion of such broad enforcement powers is especially bold at this moment in time given that the U.S. Supreme Court is highly likely to determine this Term whether the Act's delegation of unchecked enforcement powers to the Authority facially violates the private non-delegation doctrine—the Constitution's structural principle that private entities may not exercise governmental power because all legislative powers are vested in Congress, all executive powers are vested in the President and his executive departments, and all judicial powers are vested in the Supreme Court and inferior federal courts.

8.     The Authority's exercise of enforcement powers in this case presents a clear violation of the Constitution's private nondelegation doctrine.  This Court should declare the Authority's enforcement actions in this case to be unlawful and enjoin Defendants from taking any further action to enforce the Authority's unlawful fee assessments against CDI and NYRA.

## PARTIES

9.     Plaintiff Churchill Downs Incorporated conducts thoroughbred horseracing at racetracks in Kentucky, Virginia, Louisiana, and Pennsylvania.  For 150 years, CDI has held the iconic Kentucky Derby at the Churchill Downs racetrack in Louisville, making the Derby the longest continually held annual sporting event in the United States.  CDI is headquartered in Jefferson County, Kentucky.

10.     Plaintiff The New York Racing Association, Inc., conducts thoroughbred horseracing at New York's three major tracks: Aqueduct Racetrack, Belmont Park (the site of the Belmont Stakes), and Saratoga Race Course.  NYRA's mission is to create world-class experiences that advance the sport of horseracing with integrity, safety, and innovation, and NYRA's tracks are the cornerstone of New York State's thoroughbred horseracing industry.  NYRA is headquartered in Queens County, New York.

11.     Defendant Horseracing Integrity and Safety Authority, Inc. (the "Authority") is a private nonprofit corporation chartered under the laws of Delaware with its principal place of business at 250 W. Main Street, Lexington, Fayette County, Kentucky 40507.  The Act, as amended, delegates to the Authority the powers to (1) draft regulations that implement a horseracing anti-doping and medication-control program and racetrack-safety program; (2) assess and collect fees from covered persons to fund the Authority's operations; and (3) enforce the Act's and the Authority's implementing regulations against covered persons by conducting investigations, imposing civil sanctions, and bringing civil actions in federal court.

12.     Defendant Lisa Lazarus is the Chief Executive Officer of the Authority.  In her capacity as CEO, she oversees the Authority's full operations.  On information and belief, Lazarus resides in Montclair, Essex County, New Jersey.

13.     Defendant Charles Scheeler is an independent director serving as Chair of the Board of Directors of the Authority.  He is a retired partner at the law firm DLA Piper.  On information and belief, Scheeler resides in Towson, Baltimore County, Maryland.

14.     Defendant Steve Beshear is an independent director serving on the Board of Directors of the Authority.  He served as the Governor of Kentucky between 2007 and 2015.  On information and belief, Beshear resides in Lexington, Fayette County, Kentucky.

5

15.    Defendant Adolpho Birch is an independent director serving on the Board of Directors of the Authority.  He is senior vice president of business affairs and the Chief Legal Officer for the National Football League's Tennessee Titans.  On information and belief, Birch resides in Nashville, Davidson County, Tennessee.

16.    Defendant Leonard S. Coleman, Jr. is an independent director serving on the Board of Directors of the Authority.  He served as the president of the National League of Professional Baseball Clubs from 1994 to 1999.  On information and belief, Coleman resides in Palm Beach, Palm Beach County, Florida.

17.    Defendant Joseph De Francis is an industry director serving on the Board of Directors of the Authority.  He is the managing partner of Gainesville Associates, LLC.  On information and belief, De Francis resides in Chevy Chase, Montgomery County, Maryland.

18.    Defendant Terri Mazur is an independent director serving on the Board of Directors of the Authority.  She previously served as a partner at the law firms Mayer Brown LLP and Arnold Porter Kaye Scholer LLP, and most recently was a Shareholder at Greenberg Traurig, LLP.  On information and belief, Mazur resides in Franklin Lakes, Bergen County, New Jersey.

19.    Defendant Susan Stover is an industry director serving on the Board of Directors of the Authority.  She is a professor of surgical and radiological sciences at the University of California, Davis, School of Veterinary Medicine.  On information and belief, Stover resides in Winters, Yolo County, California.

20.    Defendant Bill Thomason is an industry director serving on the Board of Directors of the Authority.  He is the former president and CEO of Keeneland Association, Inc., a thoroughbred racetrack and horse-auction complex.  On information and belief, Thomason resides in Lexington, Fayette County, Kentucky.

21.     Defendant D.G. Van Clief is an industry director serving on the Board of Directors of the Authority.  He was previously president of Breeders' Cup Limited.  On information and belief, Van Clief resides in Charlottesville, Albemarle County, Virginia.

22.     Defendant the United States of America is sued as a party to a claim seeking injunctive decrees against federal officers.  *See* 5 U.S.C. § 702.  Its county of residence is the District of Columbia.

23.     Defendant Federal Trade Commission is a U.S. governmental agency headquartered in Washington, D.C.  The Act delegates to the Commission limited powers to review enforcement actions undertaken by the Authority and to approve or disapprove the Authority's draft regulations governing horseracing anti-doping, medication control, and racetrack safety.  Its county of residence is the District of Columbia.

24.     Defendant Lina Khan is the Chair of the Federal Trade Commission.  Plaintiffs are suing Chair Khan in her official capacity.  Accordingly, her county of residence is the District of Columbia.

25.     Defendant Rebecca Kelly Slaughter is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Slaughter in her official capacity.  Accordingly, her county of residence is the District of Columbia.

26.     Defendant Alvaro Bedoya is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Bedoya in his official capacity.  Accordingly, his county of residence is the District of Columbia.

27.     Defendant Melissa Holyoak is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Holyoak in her official capacity.  Accordingly, her county of residence is the District of Columbia.

28.    Defendant Andrew N. Ferguson is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Ferguson in his official capacity.  Accordingly, his county of residence is the District of Columbia.

## JURISDICTION AND VENUE

29.    This action arises under the U.S. Constitution and the Horseracing Integrity and Safety Act, 15 U.S.C. § 3051 *et seq.*  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.  The Court is authorized to issue the nonmonetary relief sought herein pursuant to law and its inherent equitable powers.  *See* 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57, 65.

30.    Venue is proper in this Court as to the federal defendants under 28 U.S.C. § 1391(e)(1) because this is an action against officers and an agency of the United States, a substantial part of the events or omissions giving rise to the claims occurred in the Louisville Division of this District, and CDI resides in the Louisville Division of this District and no real property is involved in the action.

31.    Venue is proper in this Court as to the remaining defendants under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Louisville Division of this District and, alternatively, because multiple defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

**I.    The Horseracing Integrity And Safety Act Of 2020**

32.    On December 27, 2020, as part of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020), Congress passed the Horseracing Integrity and Safety Act of 2020, 15 U.S.C. § 3051 *et seq.*

A.      **The Regulatory Structure Of The Authority**

33.     The Act recognizes "[t]he private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority,' . . . for purposes of developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." 15 U.S.C. § 3052(a).

34.     The Act defines the term "covered horse" as

> any Thoroughbred horse, or any other horse made subject to [the Act] by election of the applicable State racing commission or the breed governing organization for such horse . . . during the period—(A) beginning on the date of the horse's first timed and reported workout at a racetrack that participates in covered horseraces or at a training facility; and (B) ending on the date on which the Authority receives written notice that the horse has been retired.

15 U.S.C. § 3051(4).

35.     The Act defines the term "covered horserace" as "any horserace involving covered horses that has a substantial relation to interstate commerce." 15 U.S.C. § 3051(5).

36.     The Act defines the term "covered persons" as "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." 15 U.S.C. § 3051(6).

37.     The Act defines "racetrack" as "an organization licensed by a State racing commission to conduct covered horseraces." 15 U.S.C. § 3051(15).

38.     The Authority is governed by a nine-member Board of Directors, consisting of five "independent members selected from outside the equine industry," one of whom shall be the Chairman, and four "industry members selected from among the various equine constituencies,"

provided that the Board "include not more than one industry member from any one equine constituency." 15 U.S.C. § 3052(b)(1)–(2).

39.     The Act provided for the initial members of the Authority's Board to be selected by a "nominating committee of the Authority . . . comprised of seven independent members selected from business, sports, and academia," with its initial composition to be set forth in the Authority's governing corporate documents. 15 U.S.C. § 3052(d). Thereafter, the nominating committee "recommend[s] individuals to fill any vacancy on the Board" or its standing committees. *Id.* § 3052(d)(3)(B).

40.     The Act does not grant any governmental entity, official, or employee the right to approve or disapprove the nominating committee's selection of members of the Board of the Authority.

41.     The Authority's nominating committee announced its selections for the initial composition of the Board on May 5, 2021. It named Steve Beshear, Leonard Coleman, Ellen McClain, Charles Scheeler, and Adolpho Birch as independent directors. It named Joseph De Francis, Susan Stover, Bill Thomason, and D.G. Van Clief as industry directors.

42.     The Act defines the "program effective date"—*i.e.*, the date the Authority's racetrack-safety and anti-doping and medication-control programs were to go into effect—as July 1, 2022. 15 U.S.C. § 3051(14).

43.     The Act does not provide for the appropriation of funds necessary for the Authority's operations. *See* 15 U.S.C. § 3052(f)(5) ("Nothing in this Act shall be construed to require . . . the appropriation of any amount to the Authority; or . . . the Federal Government to guarantee the debts of the Authority."). Instead, it provides that no later than 90 days before the program effective date and no later than "November 1 each year thereafter," the Authority shall

"determine and provide to each State racing commission the estimated amount required from the State" for "the State's proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year" and "to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year."  15 U.S.C. § 3052(f)(1)(C)(i).

44.     The Act requires each State's proportionate share to be based on two things: (1) the Authority's annual budget for the following year; and (2) "the projected amount of covered racing starts for the year in each State."  15 U.S.C. § 3052(f)(1)(C)(ii)(I).

45.     The Act provides for two alternative mechanisms for the Authority to collect each State's proportionate share of the Authority's annual fees.  First, a state racing commission may "elec[t] to remit fees" and, if it does so, "the election shall remain in effect and the State racing commission shall be required to remit fees . . . according to a schedule established in rule developed by the Authority and approved by" the Federal Trade Commission.  15 U.S.C. § 3052(f)(2).  The state racing commission must give the Authority at least one year's notice before it withdraws that election.  *Id.* § 3052(f)(2)(C).

46.     Second, if a State does not wish to collect and remit fees demanded by the private Authority, the Authority shall, at least monthly, "calculate the applicable fee per racing start multiplied by the number of racing starts in the State during the preceding month."  15 U.S.C. § 3052(f)(3)(A).  The Authority will then "allocate equitably the amount calculated . . . among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate," and the Authority will directly collect fees from the covered persons, who "shall be required to remit such fees to the Authority."  *Id.* § 3052(f)(3)(B)–(C).

47.     By giving the Authority the power to collect fees from members of the horseracing industry and requiring those members to comply with the Authority's demands in order to fund a Congressionally mandated regulatory program, 15 U.S.C. § 3052(f)(3)(B)–(C), the Act gives a private corporation the uniquely governmental power of taxation.

48.     The Act requires the Authority to submit to the Federal Trade Commission proposed rules or modifications of rules relating to (1) its bylaws; (2) "a list of permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods"; (3) "laboratory standards for accreditation and protocols"; (4) "standards for racing surface quality maintenance"; (5) "racetrack safety standards and protocols"; (6) "a program for injury and fatality data analysis"; (7) "a program of research and education on safety, performance, and anti-doping and medication control"; (8) "a description of safety, performance, and anti-doping and medication control rule violations applicable to covered horses and covered persons"; (9) "a schedule of civil sanctions for violations"; (10) "a process or procedures for disciplinary hearings"; and (11) "a formula or methodology for determining assessments" against state racing commissions or covered persons.  15 U.S.C. § 3053(a).

49.     For these types of rules, the Commission must publish the Authority's proposed rule or modification in the Federal Register and provide an opportunity for public comment.  15 U.S.C. § 3053(b).  Within 60 days of publication in the Federal Register, the Commission must approve the Authority's proposed rule or modification so long as it is "consistent with" the Act and with "applicable rules approved by the Commission."  *Id.* § 3053(c).

50.     The Act does not permit the Commission, when it reviews the Authority's proposals, to modify the rule and approve it as modified.  Instead, "the Commission shall approve or disapprove the proposed rule or modification."  15 U.S.C. § 3053(c)(1).  If the Commission

disapproves the Authority's proposed rule or modification, it shall within 30 days of its disapproval "make recommendations to the Authority to modify the proposed rule or modification," and the Authority "may" resubmit a new proposed rule or modification incorporating the Commission's recommendations. *Id.* § 3053(c)(3). Congress later amended the Act to give the FTC authority, "by rule in accordance with section 553 of Title 5," to "abrogate, add to, and modify the rules of the Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter." *Id.* § 3053(e).

### B.    The Powers And Duties Of The Authority

51.    The Act gives the Authority, the Commission, and the anti-doping and medication-control enforcement agency "independent and exclusive national authority over—(A) the safety, welfare, and integrity of covered horses, covered persons, and covered horseraces; and (B) all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, and covered horseraces." 15 U.S.C. § 3054(a)(2). And the Act gives the Authority, the Commission, and the anti-doping enforcement agency authority "similar to such authority of the State racing commissions before" July 1, 2022. *Id.* § 3054(a)(3).

52.    The Act then states that "[t]he rules of the Authority promulgated in accordance with [the Act] shall preempt any provision of State law or regulation with respect to matters within the jurisdiction of the Authority under [the Act]." 15 U.S.C. § 3054(b).

### i.    The Horseracing Anti-Doping And Medication-Control Program

53.    The Act requires the Authority, following the notice-and-comment procedures above, to "establish a horseracing anti-doping and medication control program." 15 U.S.C.

13

§ 3055(a)(1).  As part of this program, the Act specifically directs the Authority to adopt a number of regulations, such as national standards for "the administration of medication to covered horses" and "laboratory testing accreditation and protocols," as well as a "list of permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods."  *Id.* §§ 3055(c)(1), 3057(b).  The Authority must develop a process for reviewing the administration of medication to a covered horse within 48 hours before that horse's next scheduled racing start.  *Id.* § 3055(c)(2).  The program generally prohibits the "administration of any prohibited or otherwise permitted substance to a covered horse within 48 hours of its next racing start."  *Id.* § 3055(d).

54.    The Authority must also develop requirements concerning any agreement it enters into with its chosen anti-doping enforcement agency.  15 U.S.C. § 3055(c)(3).  The Act requires the enforcement agency to recommend anti-doping and medication-control regulations to the Authority; conduct and oversee independent investigations; charge and adjudicate potential rule violations; enforce any civil sanctions; manage test distribution, sample collection, and testing; and accredit and monitor laboratories.  *Id.* § 3055(c)(4).  Any final decision or sanction of the anti-doping enforcement agency is considered the "final decision or civil sanction of the Authority." *Id.* § 3055(c)(4)(B).

55.    The Act provides a set of baseline rules drawn from international anti-doping rules that "constitute the initial rules of the horseracing anti-doping and medication control program." 15 U.S.C. § 3055(g)(1)–(2).  The Authority may submit modifications of these baseline rules to the Commission in the exercise of its regulatory powers, but the Authority cannot "approve any proposed modification that renders an anti-doping and medication control rule less stringent than

the baseline [rules] . . . without the approval of the anti-doping and medication control enforcement agency." *Id.* § 3055(g)(3).

ii.      The Racetrack-Safety Program

56.      The Act also requires the Authority, following the notice-and-comment procedures described above, to "establish a racetrack safety program." 15 U.S.C. § 3056(a)(1). In developing this program, the Authority must consider existing national, foreign, and international safety standards. *Id.* § 3056(a)(2).

57.      The Act requires the racetrack-safety program to include: (1) training and racing safety standards and protocols that account for regional differences and differences between racing facilities; (2) uniform training and racing safety standards "consistent with the humane treatment of covered horses"; (3) a "racing surface quality maintenance system"; (4) uniform "track safety standards"; (5) "[p]rograms for injury and fatality data analysis"; (6) investigations relating to safety violations; (7) "[p]rocedures for investigating, charging, and adjudicating violations and for the enforcement of civil sanctions for violations"; (8) "[a] schedule of civil sanctions for violations"; (9) "[d]isciplinary hearings"; (10) "[m]anagement of violation results"; (11) "[p]rograms relating to safety and performance research and education"; and (12) "[a]n evaluation and accreditation program that ensures that racetracks" meet the standards of the racetrack-safety program. 15 U.S.C. § 3056(b).

58.      The Act also requires the Authority to issue a rule establishing standards for the accreditation of racetracks under the racetrack-safety program. 15 U.S.C. § 3056(c)(2). And within one year after July 1, 2022, the Act required the Authority to issue a rule establishing a "nationwide database of racehorse safety, performance, health, and injury information," and the

Authority "may require covered persons to collect and submit to the database . . . such information as the Authority may require to further the goal of increased racehorse welfare." *Id.* § 3056(c)(3).

      iii.      <u>Enforcement And Sanctions Authority</u>

59.    The Act requires the Authority to develop and issue, pursuant to the notice-and-comment process described above, uniform rules permitting (1) "access to offices, racetrack facilities, other places of business, books, records, and personal property of covered persons that are used in the care, treatment, training, and racing of covered horses"; (2) "issuance and enforcement of subpoenas and subpoenas duces tecum"; and (3) "other investigatory powers of the nature and scope exercised by State racing commissions." 15 U.S.C. § 3054(c)(1)(A). The Authority may also "recommend that the Commission commence an enforcement action" concerning "an unfair or deceptive act or practice." *Id.* § 3054(c)(1)(B).

60.    "As a condition of participating in covered races and in the care, ownership, treatment, and training of covered horses," the Act requires "a covered person" to "register with the Authority" pursuant to rules prepared by the Authority and approved by the Commission. 15 U.S.C. § 3054(d)(1). The registrant must agree "to be subject to and comply with" the enforcement rules the Authority adopts under Section 3054(c). *Id.* § 3054(d)(2).

61.    The Act requires the Authority to issue, through the notice-and-comment process described above, "a description of safety, performance, and anti-doping and medication control rule violations." 15 U.S.C. § 3057(a)(1). The Act provides a lengthy list of the types of actions that the Authority may define as violations, including the detection of a prohibited substance in a sample, the use or attempted use of a prohibited substance or treatment method, the possession or attempted possession of a prohibited substance or method, the refusal "to submit a covered horse for sample collection," the failure to cooperate or respond truthfully to the Authority or its agent

during an investigation, the tampering or attempted tampering with the enforcement of the Authority's rules, covering up or helping to cover up a violation of the Authority's rules, and attempting to intimidate a person from reporting a violation of the Authority's rules. *Id.* § 3057(a)(2). The Act does not include nonpayment of the Authority's assessed fees as a potential violation of the Authority's "safety, performance, and anti-doping and medication control rule[s]" under § 3057. *Id.* § 3057(a)(1).

62.    Any registered person must "cooperate with the Commission, the Authority, the anti-doping and medication control enforcement agency, and any respective designee, during any civil investigation" and must "respond truthfully and completely" to any question asked by "the Commission, the Authority, the anti-doping and medication control enforcement agency, or any respective designee." 15 U.S.C. § 3054(d)(3). The Act states that failure to cooperate is a civil violation. *Id.* § 3054(d)(4).

63.    The Act grants the Authority "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction" and requires it to "develop a list of civil penalties with respect to the enforcement of rules for covered persons and covered horseraces under its jurisdiction." 15 U.S.C. § 3054(h)–(i).

64.    The Act does not grant any governmental entity, official, or employee the right to approve or disapprove the Authority's decision to issue a subpoena or exercise its investigatory authority.

65.    The Act requires the Authority to issue, through the notice-and-comment process described above, rules governing its internal "disciplinary process for safety, performance, and anti-doping and medication control rule violations," including notification to the violator, hearing

procedures, the burden of proof, presumptions, rules of evidence, appeals, and guidelines for the "confidentiality and public reporting of decisions."  15 U.S.C. § 3057(c).

66.     The Act requires the Authority to "establish uniform rules, in accordance with section 3053 of this title, imposing civil sanctions" for violations of its rules; these sanctions may include "lifetime bans from horseracing, disgorgement of purses, monetary fines and penalties, and changes to the order of finish in covered races."  15 U.S.C. § 3057(d).

67.     A "person aggrieved by the civil sanction" may apply to the Commission for review of the sanction by an administrative law judge.  15 U.S.C. § 3058(b).  The decision of the administrative law judge is to be the final decision of the Commission, unless the Commission exercises its discretion to review the decision of the administrative law judge.  *Id.* § 3058(b)(3)(B), (c).  In addition to these civil sanctions, the Act also permits the Authority to

> commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation[,] . . . to enjoin such acts or practices, to enforce any civil sanctions imposed . . . , and for all other relief to which the Authority may be entitled.

*Id.* § 3054(j)(1).

68.     The Authority would have no power to regulate the horseracing industry beyond voluntarily affiliated entities without the Act.  The Act gives the Authority's regulations preemptive force over contrary state law.  15 U.S.C. § 3054(b).  Because the Constitution gives preemptive force to only federal law, *see* U.S. Const. art. VI, cl. 2, the Authority's regulations are binding on the States and the regulated industry only because the Act gives the Authority's regulations the force of federal law.  Without the Act, the Authority's rules would be merely precatory, and the Authority would have no means of enforcing them.

69.     If the Authority's rules were not federal law, the Authority would have no power to sanction a member of the industry because the member could ignore any attempts at discipline

with impunity. *See* 15 U.S.C. § 3057(d). The Authority would have no right to sue to enforce a violation of the Act or its rules in federal court. *See id.* § 3054(j). The Authority would have no right to investigate a potential violation of its rules and would be deemed a trespasser if it attempted to do so. *See id.* § 3054(c), (h). Finally—and critically in this case—the Authority would have no ability to fund itself because the private Authority would have no power to compel a member of the horseracing industry to fund its activities. *See id.* § 3052(f)(3)(C)(ii). Without the ability (granted by the Act) to invoke the full coercive power of the state to demand compliance with its rules, the Authority would be a toothless entity with the power to issue only recommendations.

## II.    The History Of The Implementation Of The Act

### A.    The Authority's Assessment-Methodology Rules And Enforcement Rules

70.    To date, the Authority has promulgated—and the FTC has approved—rules to implement the Act's racetrack-safety program (Rule Series 2000), rules to implement the Act's anti-doping and medication-control program (Rule Series 3000, 4000, 5000, and 6000), rules governing arbitration procedures (Rule Series 7000), registration rules (Rule Series 9000), and—of particular relevance to this case—enforcement rules (Rule Series 8000) and rules providing the Authority's methodology for determining annual fee assessments (Rule Series 8500). Horseracing Integrity and Safety Authority, *Regulations*, https://hisaus.org/regulations.

71.    The Authority's roll-out of these regulations was marked by an unusual degree of chaos and confusion. Despite being statutorily required to establish the anti-doping and medication control program by July 1, 2022, 15 U.S.C. §§ 3051(14), 3055(a)(1), those rules were not implemented until May 22, 2023, Horseracing Integrity and Safety Authority, *Regulations*, https://hisaus.org/regulations. And the Authority was forced to "postpone enforcement" of its rules governing specifications for horseshoes and riding crops because the Authority's rules "were

functionally impossible for industry participants to implement due to limited supply chain availability of horseshoes and riding crops," raising "questions about what industry representatives were consulted in the drafting of the rule."  Letter from Senators Grassley, Manchin, Ernst, and Kennedy to Chair Khan and Lisa Lazarus (June 27, 2022), https://www.grassley.senate.gov/imo/media/doc/grassley_et_altoftchorseracingintegrityandsafetyauthorityhisaimplementation.pdf. This prompted four U.S. Senators to write a letter to the FTC and the Authority stating that "[t]his chaotic implementation process and poor communication by the Authority makes it difficult for industry participants to comply with the new rules and regulations." *Id.*

> i.    The Authority's Assessment-Methodology Rules

72.    The FTC approved the Authority's original assessment-methodology rule in April 2022.  FTC, *Order Approving the Assessment Methodology Rule Proposed by the Horseracing Integrity and Safety Authority* (Apr. 1, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/Order%20re%20HISA%20Assessment%20Methodology.pdf.

73.    Even though the Act requires that the annual amount required from each State be based on (1) the Authority's budget for the following year and (2) the projected number of racing starts in the State, 15 U.S.C. § 3052(f)(1)(C)(ii), the Authority's rule calculates each State's annual fees based on a non-statutory criterion: the dollar value of the racing purses in each State. *See* 89 Fed. Reg. 84,600, 84,602 (Oct. 23, 2024) ("The underlying principle of the current assessment methodology is to focus on purses actually paid.").

74.    Specifically, the Authority promulgated the following complex method for determining each State's proportionate share of the Authority's total fee assessments each year:

[(c)](1) the total amount due from all States pursuant to 15 U.S.C. 3052(f)(1)(C)(i) shall be divided by the Projected Starts of all Covered Horseraces; then

(2)    50 percent of the quotient calculated in (c)(1) is multiplied by the quotient of

       (i)      the relevant State's percentage of the total amount of purses for all covered horseraces as reported by Equibase (not including the Breeders' Cup World Championships Races), after taking into consideration alterations in purses for the relevant State for the following calendar year; divided by

       (ii)     the relevant State's percentage of the Projected Starts of all covered horserace starts; then

(3)     the sum of (i) the product of the calculation in (c)(2) and 50 percent of the quotient calculated in (c)(1) is multiplied by the Projected Starts in the applicable State. Provided however, that no State's allocation shall exceed 10 percent of the total amount of purses for covered horseraces as reported by Equibase in the State (not including the Breeders' Cup World Championships Races). All amounts in excess of the 10 percent maximum shall be allocated proportionally to all States that do not exceed the maximum based on each State's respective percentage of the Annual Covered Racing Starts.

87 Fed. Reg. 67,918, 67,918–19 (Nov. 10, 2022).

75. In States whose racing commissions have elected to collect and remit the Authority's fees, the state racing commission is required to pay to the Authority one-twelfth of the State's share of fees as determined by the above methodology each month. *Id.* at 67,919.

76. In States whose racing commissions have declined to collect and remit the Authority's fees, the Authority allocates the State's share of fees among racetracks in the State pursuant to the following methodology.

77. First, the Authority calculates the "applicable fee per racing start" in the State, *see* 15 U.S.C. § 3052(f)(3)(A), as follows:

[e](1)  The Authority shall on a monthly basis calculate and notify each Racetrack in the State of the applicable fee per racing start for the next month based upon the following calculations:

       (i)      Calculate the amount due from the State as if the State had elected to remit fees pursuant to 15 U.S.C. 3052(f)(2) (after taking into account any partial payment under Rule 8520(a)) (the "Annual Calculation").

       (ii)     Calculate the number of starts in covered horseraces in the previous twelve months as reported by Equibase (the "Total Starts").

      (iii)    Calculate the number of starts in covered horseraces in the previous month as reported by Equibase (the "Monthly Starts").

      (iv)    The applicable fee per racing start shall equal (i) the quotient of Monthly Starts divided by Total Starts; (ii) multiplied by the Annual Calculation.

87 Fed. Reg. at 67,919.

78.    Second, the Authority determines the total monthly assessment for the State as follows:

[e](2)    The Authority shall on a monthly basis calculate and notify each Racetrack in the jurisdiction of the following calculations:

      (i)    Multiply the number of starts in Covered Horseraces in the previous month by the applicable fee per racing start calculated pursuant to (e)(1)(iv) above.

      (ii)    The calculation set forth in 15 U.S.C. 3052(f)(3)(A) shall be equal to the amount calculated pursuant to paragraph (e)(2)(i) (the "Assessment Calculation").

87 Fed. Reg. at 67,919.

79.    Finally, "[t]he Authority shall allocate the monthly Assessment Calculation proportionally based on each Racetrack's proportionate share in the total purses in covered horseraces in the State over the next month and shall notify each Racetrack in the jurisdiction of the amount required from the Racetrack." *Id.*  And "[e]ach Racetrack shall pay its share of the Assessment Calculation to the Authority within 30 days of the end of the monthly period." *Id.*

80.    The Authority largely outsources to racetracks the allocation of fees among racetracks and other covered persons in the State (*e.g.*, "trainers, owners, breeders, jockeys, . . . veterinarians," etc., 15 U.S.C. § 3051(6)).  Its assessment-methodology requires that "not later than December 10 each year," "each Racetrack in the State shall submit to the Authority its proposal for the allocation of the Assessment Calculation among covered persons involved with covered horseraces (the 'Covered Persons Allocation')."  87 Fed. Reg. at 67,919.  "On or before 30 days from the receipt of the Covered Persons Allocation from the Racetrack, the Authority shall

determine whether the Covered Persons Allocation has been allocated equitably in accordance with 15 U.S.C. 3052(f)(3)(B) and if so, the Authority shall notify the Racetrack that the Covered Persons Allocation is approved." *Id.* But "[i]f a Racetrack fails to submit its proposed Covered Person Allocation in accordance with the deadlines set forth in this paragraph, or if the Authority has not approved the Covered Persons Allocation in accordance with this paragraph, the Authority shall determine the Covered Persons Allocation for the Racetrack." *Id.* Once the Authority determines or approves the Covered Persons Allocation for a racetrack, "the Racetrack shall collect the Covered Person Allocation from the covered persons involved with covered horseraces." *Id.*

81.     The Authority's assessment methodology also provides for the adjustment of its fee assessments—which are based on projected racing starts and projected purses—based on the *actual* number of starts and amount of purses. "Not later than March 1 of each year, the Authority shall calculate the actual number of starts in Covered Horseraces as reported by Equibase for the previous calendar year and the actual total amount of purses for Covered Horseraces as reported by Equibase for the previous calendar year and apply such amount to the calculations set forth in Rule 8520(c) instead of the projected amounts," resulting in the "True-Up Calculation." *Id.* "The allocation due from each State in the current year shall be equitably adjusted to account for any differences between the estimated amount provided to the State racing commission pursuant to Rule 8520(b) for the previous year and the True-Up Calculation." *Id.*

82.     Another court has already concluded that the Authority's fee-assessment methodology is likely unlawful. Because the Act requires that each State's proportionate share of the Authority's annual fees "is to be based on two yearly things: (1) the annual [Authority] budget and (2) the projected amount of covered racing starts in each State," and the Authority's "methodology includes 'a metric that is not part of the Act's basis of calculation of fees—purses,'"

23

the U.S. District Court for the Western District of Louisiana concluded that a group of plaintiffs was likely to succeed on its claim that "the Assessment Methodology Rules are unlawful." *Louisiana v. Horseracing Integrity & Safety Authority Inc.*, 617 F. Supp. 3d 478, 498 (W.D. La. 2022).  The court reasoned that while the Act provides the Authority "limited discretion . . . for determining funding," the Authority "went outside the bounds of the Act and its authority for calculations" by "adding th[e] additional metric" of purses.  *Id.*  The court accordingly granted a preliminary injunction barring the Authority from applying its assessment methodology to the plaintiffs in that case.  *Id.* at 502.

83.    The court also enjoined the Authority from enforcing its investigatory powers under Rule 8400, which violate the Act "by allowing seizure of, not just access to," records and extend the Authority's investigatory authority over personal property "'used in the care, treatment, training and racing of covered horses'" to "any other places of business of any person who owns a covered horse." *Id.* at 497.  In September 2023, the Western District of Louisiana subsequently stayed all proceedings pending the decision of the Fifth Circuit in a facial challenge to the Act's constitutionality under the private nondelegation doctrine.  Dkt. 100, *Louisiana v. Horseracing Integrity & Safety Authority Inc.*, No. 6:22-cv-01934-TAD-DJA (W.D. La. Sept. 14, 2023).  That stay remains in effect.

84.    In response, the Authority proposed—and the FTC approved—a modification to its assessment-methodology rule providing a back-up methodology applicable whenever its primary methodology is enjoined because it is inconsistent with the Act.  This back-up method provides: "In the event that any court of competent jurisdiction issues an injunction that enjoins the enforcement of the Rule 8500 Series based on the use of Projected Purse Starts in the Assessment Methodology Rule, the applicable States, Racetracks, and Covered Persons, as the case may be,

shall pay the allocation due from each State pursuant to 15 U.S.C. 3052(f)(1)(C) and 15 U.S.C. 3052(f)(3)(A)–(C) proportionally by the applicable State's respective percentage of Projected Starts (the 'Alternative Calculation')." 87 Fed. Reg. at 67,919.

85.    In approving the Authority's "Alternative Calculation," the FTC noted that "[t]he original Assessment Methodology rule provides that each state's proportionate share of costs be calculated based not only on projected starts (i.e., the total number of horses that race in covered races) but also based on projected purse (i.e., the amount of winnings for covered races)." FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* 4 (Jan. 9, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/order_re_hisa_assessment_methodology_modification_not_signed_002_0.pdf.    The FTC concluded that "[i]f the purse-and-starts calculation is found to be inconsistent with the Act and enjoined by a court, new Rule 8520(g) would provide for fees to be assessed based only on starts—a methodology that would be consistent with a court's finding that the Act permits only starts to be considered." *Id.* at 4–5.

86.    The Authority has since retreated even further from its original assessment methodology, recently submitting to the FTC a further modification that would "eliminate consideration of the Projected Purses Paid from the current assessment equation and instead base assessments solely on Projected Starts." 89 Fed. Reg. at 84,601. The Authority "now concludes that beginning January 1, 2026, the more appropriate and equitable approach is to base assessments on Projected Starts only." *Id.* at 84,602. If approved by the FTC, the Authority's new assessment methodology would calculate each State's proportionate share of fees as follows: "(1) the total amount due from all States pursuant to 15 U.S.C. 3052(f)(1)(C)(i) shall be divided by the Projected Starts of all covered horseraces; multiplied (2) by the Projected Starts in the applicable State." *Id.*

at 84,606.   Quoting the Western District of Louisiana decision enjoining its purse-based assessment methodology, the Authority has stated that its "proposed modification will remove the threat and cost of litigation on this issue."  *Id.* at 84,603.

87.   The Authority's proposed modification would also provide for the allocation of a State's proportionate share of fees among covered persons in the State instead of further delegating the covered-persons allocation to racetracks.   If approved by the FTC, "the applicable fee per racing start for the Assessment Calculation for each Racetrack" would "be equitably allocated among covered persons as follows: Racetrack: 50%; Owners: 43.50%; Trainers: 5.00%; and Jockeys: 1.50%."  *Id.* at 84,607.  However, it would allow a "horsemen's group that represents the majority of owners and trainers racing at the applicable Racetrack" to voluntarily "pay the applicable starter fee for the owners, trainers and jockeys."  *Id.*  In such a case, it would likewise allow any such "Horsemen's Group and the Racetrack" to "mutually agree to the allocation of the applicable fee per racing start" among themselves.  *Id.*

### ii.   The Authority's Enforcement Rules

88.   Even though the Act has limited the Authority's power to define rule violations to "safety, performance, and anti-doping and medication control rule violations," 15 U.S.C. § 3057(a)(1), the Authority has listed "[f]ailure to remit fees as required under 15 U.S.C. 3052(f)(3)" among the violations subject to the Authority's in-house enforcement actions.  87 Fed. Reg. 44,399, 44,400 (July 26, 2022).

89.   The Authority has enumerated a list of available sanctions, which include fines; denial, suspension, or revocation of registration to participate in covered horseraces; "lifetime ban[s]" on horseracing; prohibitions on racetracks from conducting covered horseraces; or "any other sanction as a condition of participation in horseracing as deemed appropriate by the

Authority in keeping with the seriousness of the violation and the facts of the case, and that is consistent with the safety, welfare, and integrity of Covered Horses, Covered Persons, and Covered Horseraces." *Id.*

90.     When the Authority alleges a violation of its rules, its enforcement rule permits it to conduct an "initial hearing" before "a panel of three Board members" appointed by the Board's chair, one whom shall serve as "chair of the panel." 87 Fed. Reg. at 44,401. The Board panel "may require"—but need not allow—"the submission of written briefs or other information as will assist in the hearing of the matter." *Id.* Hearings before a Board panel "shall not be bound by the technical rules of evidence" and the panel "may admit hearsay evidence if it determines the evidence is of a type that is commonly relied on by reasonably prudent people." *Id.* at 44,402.

91.     The Board "may appoint a presiding officer to assist in regulating the orderly conduct of and presentation of evidence at the [initial] hearing." *Id.* The Board may also require the presiding officer to submit a written report after the hearing setting forth his "findings of fact, conclusions of law, and a recommended disposition," including any "recommended penalty." *Id.* The Board may also—but need not—(1) require the presiding officer to consider briefs submitted by the parties prior to the preparation of his report; or (2) provide the parties an opportunity to file exceptions to the presiding officer's hearing report. *Id.*

92.     Once the Board panel receives the hearing record (and, if applicable, the presiding officer's hearing report and any exceptions thereto), the Board panel "shall review the record and submissions" for a period that "shall not exceed 20 days unless extended by the Board." *Id.* "[W]ithin 30 days of the close of the review period," the Board panel shall issue a "written decision setting forth findings of fact, conclusions of law, and the disposition of the matter including any

penalty imposed." *Id.* If a presiding officer has submitted a hearing report, the Board panel has "discretion to adopt, modify, or reject any or all of the hearing report." *Id.*

93.     "Any decision rendered by an initial Board hearing panel may be appealed on the record to the Board, to be reviewed by a quorum of the Board which shall not include the Board members who were on the panel in the initial hearing." *Id.* A party must appeal by filing "a written request for an appeal within 10 days of receiving a written order" from the panel. *Id.* The filing of an appeal to the Board "shall not automatically stay the decision," although "[a] party may request the Board to stay the decision." *Id.*

94.     The Board has broad discretion over the conduct of appeals from initial panel decisions. It "may in its discretion review a decision based solely upon written submissions scheduled for filing with such timing and response requirements as the Board may require," and "[a]lternatively, or in addition to written submissions, the Board may set a date, time, and place for a hearing." *Id.*

95.     The Board's standard of review is also highly deferential, and the Board "shall uphold the decision" of the panel "unless it is clearly erroneous or not supported by the evidence or applicable law." *Id.* at 44,403. As with the initial Board panel, the Board on appeal may also appoint a presiding officer "to assist in regulating the orderly conduct of and presentation of evidence at a hearing" and "to issue in writing a hearing report." *Id.*

96.     The Board shall issue its written decision in the appeal, but "shall not be bound by the timing provisions . . . relating to the period for review and the issuance by the Board of its written decision" that apply to the initial Board panel hearing. *Id.* The decision of the Board on appeal "shall be the final decision of the Authority" and "shall constitute a final civil sanction subject to appeal and review in accordance with the provisions of 15 U.S.C. 3058." *Id.* The

sanctioned party may then appeal the Authority's imposition of a civil sanction for review by an administrative law judge ("ALJ"). 15 U.S.C. § 3058(b). If the ALJ affirms the Authority's imposition of a sanction, the party may appeal that decision to the FTC. *Id.* § 3058(c). If the FTC affirms the decision or denies review, the sanctioned party may then file an action challenging the sanction in federal district court. In the meantime, "[r]eview by an administrative law judge or the Commission under this section shall not operate as a stay of a final civil sanction of the Authority unless the administrative law judge or Commission orders such a stay." *Id.* § 3058(d).

97.     Accordingly, under the Authority's enforcement rule, when a member of the horseracing industry is charged with a violation of the Authority's rules and threatened with sanctions—which could be as severe as a lifetime ban on horseracing—a party must proceed through two layers of review before the private Authority and then another two layers of review before the FTC before an Article III court can even begin to consider the sanctioned party's defenses to the enforcement action. And all the while, the sanction imposed by the initial panel of the private Authority shall remain in effect during the course of a second level of Authority review (which has no time limit on when it must conclude) and two levels of FTC review, unless either the Authority or the FTC exercises discretion to stay the sanction.

### B.     Prior Litigation Over The Constitutionality Of The Act

98.     Congress's decision in the Act to give a private, politically unaccountable corporation principal responsibility for the development and enforcement of a new federal horseracing regulatory program was highly controversial, and it was challenged from the outset.

99.     Within months of the Act's enactment, multiple lawsuits were filed challenging its constitutionality. A group of States, state racing commissions, racetracks, horseracing associations, and breeders challenged the Act, alleging that the Act violated, *inter alia*, the

Constitution's private non-delegation and anti-commandeering doctrines. *See Oklahoma v. United States*, No. 5:21-cv-104-JMH (E.D. Ky.). Another group of plaintiffs, including horseracing trade associations, racetracks, and the State of Texas, filed an action challenging the Act's constitutionality under the private non-delegation and anti-commandeering doctrines in the Northern District of Texas. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-cv-071-H (N.D. Tex.). A third group of plaintiffs composed of individual members of the horseracing industry and a horseracing trade association filed an action challenging the Act's constitutionality under the private non-delegation doctrine in the Eastern District of Arkansas. *See Walmsley v. FTC*, No. 3:23-cv-00081-JM (E.D. Ark.).

100.    The district courts in all three cases rejected the plaintiffs' claims, but the Fifth Circuit on appeal concluded that the Act "is facially unconstitutional" under the private non-delegation doctrine. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022). The Court explained that, because the Act required the FTC to approve the Authority's regulations so long they were consistent with the Act and the FTC could not "review the Authority's policy choices," the FTC did "not have meaningful oversight" over the Authority's operations: "[I]t does not write the rules, cannot change them, and cannot second-guess their substance." *Id.* Accordingly, the Fifth Circuit held that "Congress has given a private entity the last word over what rules govern our nation's thoroughbred horseracing industry" in violation of the Constitution's structural delegation of all federal executive power to the President and his subordinate departments and agencies. *Id.*

101.    In response to the Fifth Circuit's decision—and before the Sixth Circuit had decided the appeal from this district—Congress amended the Act to give the FTC authority, "by rule in accordance with section 553 of Title 5," to "abrogate, add to, and modify the rules of the

Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 3053(e).

102.    When it issued its decision, the Sixth Circuit concluded that the "amended text gives the FTC ultimate discretion over the content of the rules that govern the horseracing industry," which the court held satisfied the non-delegation doctrine. *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023). The Sixth Circuit also held that this amendment precluded a *facial* challenge to the Authority's enforcement powers because—in its view—"the FTC *could* subordinate every aspect of the Authority's enforcement" to FTC control. *Id.* at 231 ("That potential suffices to defeat a facial challenge, where Oklahoma must show that the Act is unconstitutional in all its applications."). It concluded that "[t]he FTC's ultimate authority over all rules promulgated under the Act, which would include any rules related to enforcement, offers a potent answer to [the private non-delegation] concern in the context of a facial challenge." *Id.* at 233. The Sixth Circuit thus reserved decision on whether the Authority's enforcement powers are consistent with the private non-delegation doctrine "for a day when the Authority's actions and the FTC's oversight appear in concrete detail, presumably in the context of an actual enforcement action." *Id.*

103.    When the Fifth Circuit considered the constitutionality of the Act as amended, it agreed with the Sixth Circuit that "the amendment cured the nondelegation defect" it had previously found in the Act's rulemaking provisions. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 424 (5th Cir. 2024). The Fifth Circuit, however, disagreed with the Sixth Circuit that the FTC's independent rulemaking authority "can save the Authority's

enforcement powers" as a facial matter. *Id.* at 431. As the Fifth Circuit explained, the Act provides that it is the private Authority that "decides whether to investigate a covered entity for violating [the Act]'s rules," "whether to subpoena the entity's records or search its premises," "whether to sanction it," and "whether to sue the entity for an injunction or to enforce a sanction it has imposed." *Id.* at 429. In contrast, the Act does not permit the FTC "to decide whether to investigate a covered entity, whether to subpoena its records, whether to search its premises, whether to charge it with a violation, or whether to sanction or sue it." *Id.* Nor does the Act require the Authority "to seek the FTC's approval before investigating, searching, charging, sanctioning, or suing," or "empower the FTC to countermand any of the Authority's investigatory or charging decisions." *Id.* The Fifth Circuit thus concluded that the Act's enforcement provisions are facially unconstitutional because they permit the Authority to "investigate potential violations, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the say-so of the agency." *Id.* at 430.

104.    The ability of the FTC to review any final sanctions the Authority ultimately decides to impose does not eliminate this constitutional defect because such back-end review does not give the FTC control over the Authority's exercise of quintessential executive powers. The Act permits the Authority to "launch an investigation into [a horse] owner, subpoena his records, search his facilities, charge him with a violation, adjudicate it, and fine him," all "without any supervision by the FTC," and "any penalty" imposed by the Authority "goes into effect as soon as the Authority makes its decision." *Id.* at 430 (citing 15 U.S.C. § 3058(d)).

105.    When the Eighth Circuit considered the appeal from the Eastern District of Arkansas's decision rejecting plaintiffs' private non-delegation doctrine challenge, it "agree[d] with the Sixth and Fifth Circuits that the Act's rulemaking structure does not violate the private

nondelegation doctrine." *Walmsley v. Federal Trade Commission*, 117 F.4th 1032, 1038 (8th Cir. 2024). And, recognizing that its "two sister circuits reached differing conclusions" on the constitutionality of the Authority's enforcement powers, the Eighth Circuit "agree[d] with the Sixth Circuit that the statute is not unconstitutional on its face." *Id.* at 1039.

106. A circuit split therefore exists on the question whether the Act's delegation of enforcement authority to the private Authority *facially* violates the Constitution's private non-delegation doctrine, and whether that delegation is unconstitutional *as applied* in a particular enforcement action is an open question in this Circuit. Several petitions from plaintiffs in the Fifth, Sixth, and Eighth Circuit cases, the federal government, and the Authority are currently pending before the Supreme Court asking it to review the private non-delegation doctrine issues in these cases. *See Oklahoma v. United States*, No. 23-402 (U.S.); *FTC v. NHBPA*, No. 24-429 (U.S.); *Horseracing Integrity and Safety Authority, Incorporated v. NHBPA*, No. 24-433 (U.S.); *Texas v. Black*, No. 24-465 (U.S.); *NHBPA v. Horseracing Integrity and Safety Authority, Inc.*, No. 24-472 (U.S.); *Gulf Coast Racing, L.L.C. v. Horseracing Integrity and Safety Authority, Inc.*, No. 24-489 (U.S.); *Walmsley v. FTC*, No. 24-420 (U.S.). It is highly likely that the Supreme Court will grant certiorari this Term to resolve—at a minimum—the question of whether the Act's delegation of enforcement powers to the Authority facially violates the Constitution.

### III.    The Authority's Enforcement Actions Against CDI And NYRA

107. Because CDI and NYRA conduct thoroughbred horseraces at their racetracks—including the iconic Kentucky Derby and Belmont Stakes—the private Authority has been invoicing CDI and NYRA since 2023 for their proportionate shares of the Authority's assessments pursuant to its purse-based assessment methodology.

108.    Because the Kentucky and New York racing commissions have declined to collect and remit to the Authority their States' shares of assessments, the Authority has been directly collecting the assessments imposed on CDI and NYRA itself.  *See* 15 U.S.C. § 3052(f)(3).

109.    CDI and NYRA have each objected to the Authority's imposition of assessments under its current assessment methodology.  They have explained that the Authority's consideration of purse amounts in its assessment methodology is inconsistent with the text of the Act and has resulted in arbitrarily disparate and inequitable fee assessments among different States, racetracks, and covered persons.

110.    *First*, despite the Act's requirement that each State's proportionate share be based on the Authority's annual budget and the projected amount of racing starts in each State, the Authority's formula for determining each State's proportionate share of its annual fee assessments has resulted in wide fee disparities in States with the highest number of racing starts, as demonstrated in the chart below.

| States | 2022 Starts | Overall Costs | Average 2023 Per-Start Fee |
|--------|-------------|---------------|------------------------------|
| NY, KY, MD, CA | 67,106 | $25,040,260 | $373.14 |
| FL, LA, OH, PA, WV | 99,230 | $24,484,889 | $246.75 |

Florida, Louisiana, Ohio, Pennsylvania, and West Virginia combined had 47.87% *more* racing starts than New York, Kentucky, Maryland, and California combined in 2022.  Yet the first group of States was charged $555,371 *less* than the second group of States in 2023.  On a per-start basis, this means that racetracks in New York, Kentucky, Maryland, and California are being charged 51.22% more than racetracks in Florida, Louisiana, Ohio, Pennsylvania, and West Virginia.

111.    *Second*, the Authority's formula has resulted in widely disparate per-start fees among different racetracks.  This differential treatment cannot be justified based on the number of each track's racing starts or even the size of its purses, as the charts below demonstrate.

| Racetrack | 2022 Starts | 2022 Purses | 2023 Per-Start Fee |
|---|---|---|---|
| Rillito Park | 307 | $492,316 | $138.38 |
| Finger Lakes | 5,009 | $15,724,896 | $137.07 |

| Racetrack | 2022 Starts | 2022 Purses | 2023 Per-Start Fee |
|---|---|---|---|
| Charlestown | 10,095 | $35,992,800 | $273.69 |
| Del Mar | 3,557 | $32,582,744 | $467.95 |

112.   The Authority's assessment formula thus benefits racetracks that have a large number of racing starts with small purses.   Yet as the Authority has recognized, "numerous stakeholders have initiated litigation against the Authority over the use of paid purses in the Cost Methodology Rule.  In fact, many of these entities benefit from the use of purses in the assessment formula but nevertheless believe that actual starts should be the sole basis for calculating the assessments. … As is evident from the list of plaintiffs in the proffered Amended Complaint, many of the States that benefit from the purses paid portion of the assessment calculation reject this benefit as being inconsistent with the Act."  89 Fed. Reg. at 84603.

113.   Accordingly, because the private Authority has imposed fees on CDI and NYRA based on an unlawful assessment methodology that is inconsistent with the Act and results in arbitrary and inequitable fee disparities, CDI and NYRA have declined to remit to the Authority the full amount of the fees it has demanded from them.  Instead, CDI and NYRA have remitted fees to the Authority in accordance with methodologies that would be equitable and consistent with the Act's statutory mandate that fees be based on the number of racing starts, not the value of purses.  The Authority has purported to apply CDI's and NYRA's payments of fees for the 2024 calendar year to "the 2023 amounts outstanding until such point as 2023 was fully paid."

114.   The Authority previously acceded to payments made under a methodology based on racing starts, rather than the Authority's purse-based methodology.  In 2023, CDI's CEO (Bill Carstanjen) informed the Authority's CEO (Lisa Lazarus) that CDI would pay fees in line with a

starts-based methodology. The Authority's CEO confirmed: "When we last spoke about the [Act's] Assessment, during which you were very clear with me (and have been consistently) that you consider any methodology other than one based on pure starts to be illegal, I agreed to accept payment on the basis of pure starts until such time as that legal question is resolved by the courts."

115. CDI also confirmed its starts-based payment methodology in a May 2023 email to the Authority. In response, the Authority's CFO (Jim Gates) wrote that "[m]y understanding is that Bill and Lisa agreed that this would be okay until that ruling came down, at which point CDI would pay the difference if the current methodology was ruled constitutional"—"[s]o for the foreseeable future I think we're on the same page with CDI's assessments being calculated 100% based on starts." The "ruling" referred to the *Louisiana* case, *supra* ¶ 82, which found the Authority's assessment methodology was likely unlawful. *Louisiana*, 617 F. Supp. 3d at 498. Another email from the Authority's CFO to CDI in March 2024 confirmed that "[a]s I understand it, the agreement between Bill Carstanjen and Lisa Lazarus was for CDI to pay based on starts only (no purses paid component)."

116. CDI made, and the Authority accepted, payments under that methodology for nearly two years. CDI made those payments even for tracks where the Authority's purse-based methodology would have resulted in a lower assessment (such as Presque Isle Downs, where the pure-start methodology would have resulted in an assessment that was $248,000 less than a purse-based methodology). CDI was transparent with the Authority about its payment method, and the Authority took no issue with that method for nearly two years.

117. Then the Authority abruptly shifted course. On September 12, 2024, the Authority sent an email to CDI threatening that if it did not pay the "outstanding balance" due under the

Authority's purse-based methodology, the Authority would "have no choice but to pursue an enforcement action for payment before the HISA Board."

118.    The Authority's change in position comes at a time when it is well known in the horseracing industry that the Authority is suffering from serious budgetary shortfalls.

119.    In 2023, the Authority imposed a total of $66,490,436 in assessments on the horseracing industry.  Horseracing Integrity and Safety Authority, *2023 Assessments by State* ("2023 Assessments"), https://bphisaweb.wpengine.com/wp-content/uploads/2023/01/Addendum 3-2023AssessmentsbyStateupdated.pdf.  By 2025, this figure ballooned to $80,376,289, even though the number of racing starts significantly decreased, Horseracing Integrity and Safety Authority, *HISA 2025 Proposed Budget* ("2025 Proposed Budget"), https://bphisaweb. wpengine.com/wp-content/uploads/2024/07/HISA-2025-Proposed-Budget.pdf.  Thus, the Authority's total annual assessments have *increased* by approximately 21% from 2023 even though the total number of racing starts has *decreased by over 25%* over that same period. *Compare* 2023 Assessments (noting 233,067 total racing starts), *with* 2025 Assessments (noting 173,988 racing starts).  Practically, this means tracks are paying millions of dollars more in assessments for 2025 than they did in any previous year and receiving substantially fewer services than ever before.

120.    The Authority's continued increase in assessments to fund its ever-growing budget is unsustainable.  This is demonstrated by the dramatic increases in several of the line items in the Authority's annual budget over just a few years.  Since 2023, the Authority has increased its spending on technology by 155%, its spending on legal fees by 87%, its spending on other professional services by 60%, and its spending on salaries by 35%. *Compare* Horseracing Integrity

and Safety Authority, *HISA 2023 Summary Budget*, https://bphisaweb.wpengine.com/wp-content/uploads/2023/01/Addendum1-2023HISABudgetrevised.pdf, *with* 2025 Proposed Budget.

121.    Because CDI declined to remit the millions of dollars in fees unlawfully demanded by the Authority, on November 13, 2024, the Authority sent CDI a notice that it was charging CDI with a violation of Authority Rule 8100(i), "[f]ailure to remit fees as required under 15 U.S.C. 3052(f)(3)."  The notice states that the alleged violation "is subject to the sanctions set forth in Rule 8200(b)(2)–(12)," which include "[p]rohibit[ing] a Racetrack from conducting any Covered Horserace" or even "a lifetime ban" from conducting covered horseraces, 87 Fed. Reg. at 44,400. The Authority has made clear that it is seeking such extreme coercive relief in this action, stating that it is seeking an order "(1) directing CDI to pay $1,905,142 to the Authority within twenty (20) days of the Order of the Board Panel; and (2) if payment in full is not received by the Authority by the date pr[e]scribed in the Order, that for each day the payment is late, Churchill Downs and Ellis Park be prohibited from conducting any Covered Horserace, to be applied immediately on the next scheduled race day(s) at Churchill Downs and Ellis Park."

122.    If the Authority were to prohibit CDI from conducting horseraces at Churchill Downs or Ellis Park, it would seriously harm CDI's business, corporate brand, and reputation both within the horseracing industry and with fans of horseracing.  It would also harm the numerous horse trainers, owners, breeders, jockeys, and veterinarians who rely on CDI's horseraces to make a living.

123.    The Authority has scheduled for December 5, 2024, at 9:30 AM ET an initial hearing in the enforcement action against CDI before a panel of the Board composed of Defendants Joe De Francis, Bill Thomason, and Terri Mazur, with Defendant De Francis serving as the Chair of the panel.

124.    Similarly, because NYRA declined to remit the millions of dollars in fees unlawfully demanded by the Authority, the Authority sent a letter to NYRA on August 20, 2024 demanding that it "immediately remit the full amount owed to" the Authority, stating that if NYRA did not do so, "we will have no choice but to bring an enforcement action against NYRA."  After NYRA did not comply with that demand, the Authority sent NYRA a notice on November 13, 2024 that it was charging NYRA with a violation of Authority Rule 8100(i), "[f]ailure to remit fees as required under 15 U.S.C. 3052(f)(3)."  The notice states that the alleged violation "is subject to the sanctions set forth in Rule 8200(b)(2)–(12)," *id.*, which include "[p]rohibit[ing] a Racetrack from conducting any Covered Horserace" or even "a lifetime ban" from conducting covered horseraces, 87 Fed. Reg. at 44,400.  The Authority has made clear that it is seeking such extreme coercive relief in this action, stating that it is seeking an order "(1) directing NYRA to pay $3,922,779.00 to the Authority within (20) days of the Order of the Board Panel; and (2) if payment in full is not received by the Authority by the date pr[e]scribed in the Order, that Aqueduct Racetrack, Belmont Park, and Saratoga Race Course be prohibited from conducting any Covered Horserace until payment is made in full."

125.    The Authority has scheduled for December 5, 2024, at 12:00pm ET an initial hearing in the enforcement action against NYRA before a panel of the Board composed of Defendants Joe De Francis, Bill Thomason, and Terri Mazur, with Defendant De Francis serving as the Chair of the panel.

126.    The Authority has thus threatened to effectively shut down CDI's and NYRA's horseracing businesses unless they remit millions of dollars in fees that CDI and NYRA have maintained were illegally imposed.  Absent relief from this Court, the order the Authority seeks would imminently force CDI and NYRA to cease these operations, which would not only cost the

companies significant revenue but also imperil thousands of jobs that rely on these racetracks unless CDI and NYRA submit to the Authority's demands to remit fees imposed pursuant to an illegal assessment methodology.

## COUNT ONE

### Violation Of The Administrative Procedure Act
**(Exceeding Statutory Authority – 5 U.S.C. § 706(2)(A), (C), 15 U.S.C. § 3052(f)(1)(C)(ii)(I))**

127.    All preceding paragraphs are incorporated by reference.

128.    The Act requires that each State's proportionate share of the Authority's annual fee assessments be based on the Authority's "annual budget . . . for the following calendar year" and the "projected amount of covered racing starts for the year in each State."  15 U.S.C. § 3052(f)(1)(C)(ii)(I).

129.    Yet the Authority's current assessment methodology imposes fees based on a non-statutory criterion: the amount of purses distributed to race winners.  87 Fed. Reg. at 67,918–19. As another court has already held, because the Authority's "methodology includes 'a metric that is not part of the Act's basis of calculation of fees—purses,'" the Authority "went outside the bounds of the Act and its authority for calculations."  *Louisiana*, 617 F. Supp. 3d at 498. Accordingly, the only court to have considered the question enjoined the Authority from enforcing its unlawful assessment-methodology rule.  *Id.* at 502.  And the FTC itself has noted that an assessment-methodology "based only on starts . . . would be consistent with a court's finding that the Act permits only starts to be considered."  FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* 5 (Jan. 9, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/order_re_hisa_assessment_methodology_ modification_not_signed_002_0.pdf.

130.    The Authority has also retreated from its unlawful purse-based assessment methodology.    The Authority first proposed—and the FTC approved—a rule modification providing for the assessment of fees based only on racing starts "[i]n the event that any court of competent jurisdiction issues an injunction that enjoins the enforcement of" its purse-based assessment methodology.  87 Fed. Reg. at 67,919.  Then the Authority abandoned its illegal purse-based methodology entirely (but only on a going-forward basis), proposing a rule that would transition to the racing-start-based methodology commanded by the Act on January 1, 2026.  89 Fed. Reg. at 84,606.

131.    Yet the Authority has brought enforcement actions against CDI and NYRA for declining to remit fees the Authority imposed on them pursuant to its illegal purse-based methodology.

132.    CDI and NYRA therefore request that this Court declare that the Authority's current purse-based assessment methodology is inconsistent with 15 U.S.C. § 3052(f)(1)(C)(ii)(I) and enjoin Defendants from taking any actions to enforce it against CDI and NYRA.

## COUNT TWO
### Violation Of The Administrative Procedure Act
### (Arbitrary and Capricious Agency Action – 5 U.S.C. § 706(2)(A))

133.    All preceding paragraphs are incorporated by reference.

134.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

135.    Because the Authority's purse-based assessment methodology is inconsistent with 15 U.S.C. § 3052(f)(1)(C)(ii)(I), the FTC was required to disapprove it under 15 U.S.C. § 3053(c)(2)(A).    The FTC's decision to approve the Authority's purse-based assessment

methodology was therefore "not in accordance with law" and must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

136.    In addition, it was arbitrary and capricious for the FTC to approve the Authority's assessment-methodology rule because the rule results in arbitrary and inequitable fee disparities among different States and racetracks.  The Authority's assessment methodology results in some States with fewer annual racing starts paying larger fees than States with more annual racing starts. The FTC thus acted arbitrarily and capriciously when it approved the Authority's assessment methodology.

137.    This Court should thus declare that the FTC's approval of the Authority's purse-based assessment methodology was arbitrary, capricious, and contrary to law and enjoin Defendants from taking any actions to enforce it against CDI and NYRA.

### COUNT THREE

**Violation Of The Administrative Procedure Act**
**(Arbitrary and Capricious Agency Action - 5 U.S.C. § 706(2)(A))**

138.    All preceding paragraphs are incorporated by reference.

139.    The Authority's imposition of assessments pursuant to its purse-based assessment-methodology is also arbitrary and capricious because the Authority should have imposed start-based assessments pursuant to its Rule 8520(g).  Rule 8520(g) provides that assessments of "applicable States, Racetracks, and Covered Persons" will be based purely on starts if "any court of competent jurisdiction issues an injunction that enjoins the enforcement of [the Authority's assessment-methodology] based on the use of Projected Purse Starts."  87 Fed. Reg. at 67,919. That is exactly what the Western District of Louisiana did in *Louisiana v. Horseracing Integrity & Safety Authority Inc.*, 617 F. Supp. 3d 478, thus triggering the Authority's start-based "Alternative Calculation" under Rule 8520(g).  It is arbitrary and capricious for the Authority not

to apply its own rule here. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (agency may not act "contrary to existing valid regulations").

## COUNT FOUR
### Equitable Estoppel

140.    All preceding paragraphs are incorporated by reference.

141.    "Estoppel is an equitable doctrine which a court may invoke to avoid injustice in particular cases." *Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010). "The elements of an estoppel claim are: '(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel.'" *Id.*

142.    Each of these elements is satisfied here.

143.    *First*, the Authority Defendants mispresented to CDI that it "would be okay" for CDI's assessments to be "calculated 100% based on starts" unless and until the Authority's purse-based methodology is ultimately held to be lawful in the *Louisiana* case and that "the agreement between [CDI CEO] Bill Carstanjen and [Authority CEO] Lisa Lazarus was for CDI to pay based on starts only (no purses paid component)."

144.    *Second*, CDI reasonably relied on the Authority's representation and remitted fees to the Authority based on racing starts only pursuant to their agreement.

145.    *Third*, CDI relied on the Authority's representation that it "would be okay" to remit fees based on a purse-based methodology to its detriment. The Authority is now pursuing an enforcement action against CDI and threatening to prohibit it from conducting horseraces if CDI does not immediately remit all fees due pursuant to an illegal purse-based methodology that the Authority assured CDI it need not comply with.

146.    Because each of the elements of equitable estoppel is satisfied, this Court should declare that Defendants are equitably estopped from enforcing its purse-based assessment methodology and should enjoin them from taking any action against CDI to enforce it.

### COUNT FIVE

**Violation Of The Administrative Procedure Act**
**(Exceeding Statutory Authority – 5 U.S.C. § 706(2)(C), 15 U.S.C. § 3057)**

147.    All preceding paragraphs are incorporated by reference.

148.    The Act permits the Authority to promulgate rules describing "safety, performance, and anti-doping and medication control rule violations." 15 U.S.C. § 3057(a)(1). It also permits the Authority to promulgate rules governing its internal "disciplinary process for safety-performance, and anti-doping and medication control rule violations." *Id.* § 3057(c)(1)(B).

149.    Nonpayment of assessed fees is not a "safety, performance, [or] anti-doping and medication control rule violation[]." 15 U.S.C. § 3057(a)(1), (c)(1)(B). And Congress pointedly excluded nonpayment of assessed fees—an obvious potential concern—from its exemplary list of potential violations subject to the Authority's disciplinary process. *See* 15 U.S.C. § 3057(a)(2).

150.    The Act therefore did not delegate to the private Authority the power to define non-payment of fees as a violation of its rules and adjudicate claims for non-payment through its in-house disciplinary process.

151.    Instead, Congress envisioned that the Authority would seek payment of any fees lawfully required under the Act by exercising its power to "commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation of this chapter or any rule established under this chapter" in federal court "to enjoin such acts or practices . . . and for all other relief to which the Authority may be entitled." 15 U.S.C. § 3054(j)(1).

152.    Moreover, because the Act does not empower the Authority to either define nonpayment of assessed fees as a violation of its rules or to impose civil sanctions for nonpayment of fees through its internal disciplinary process, the Authority's enforcement rule exceeds its statutory powers and it was thus arbitrary and capricious for the FTC to approve it.

153.    This Court should therefore declare that the Authority has no power to adjudicate CDI's and NYRA's alleged failure to remit fees purportedly required under 15 U.S.C. § 3052(f)(3) and enjoin Defendants from taking any action to enforce or otherwise adjudicate this fee-collection action through its internal disciplinary process.

## COUNT SIX
### Violation Of Article III Of The U.S. Constitution

154.    All preceding paragraphs are incorporated by reference.

155.    Article III of the U.S. Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.

156.    If the Act were interpreted to permit the private Authority to use its in-house disciplinary process to ban CDI and NYRA from conducting horseraces until they pay it millions of dollars in fees, it would violate Article III's commitment of such matters to the judiciary.  Article III "could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III.  That is why [the Supreme Court has] long recognized that, in general, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'"  *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

157.    Courts have recognized that the Constitution permits Congress to delegate to non-Article III governmental tribunals the adjudication of cases "involving public rights," *i.e.*, those "which arise between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell*, 285 U.S. at 50.  But Article III commits to life-tenured federal judges the adjudication of all "matters 'of private right, that is, of the liability of one individual to another under the law as defined.'" *Stern*, 564 U.S. at 489 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)).

158.    The Authority is a private corporation threatening to prohibit CDI and NYRA—two of the most prominent and long-established horseracing companies in the nation—from conducting any horseraces until they pay it millions of dollars of unlawfully imposed assessments. Article III commits the adjudication of CDI's and NYRA's alleged monetary liability to the private Authority to federal courts.

159.    This Court should declare that Article III does not permit the Authority to adjudicate its fee-collection actions against CDI and NYRA through its internal disciplinary process and enjoin Defendants from taking any action to enforce the Authority's alleged non-payment violations through the Authority's internal disciplinary process.

**COUNT SEVEN**

**Violation Of The U.S. Constitution (Private Non-Delegation Doctrine)**

160.    All preceding paragraphs are incorporated by reference.

161.    The U.S. Constitution vests all legislative power in Congress and all executive power in the President.  U.S. Const. art. I, § 1, cl. 1; *id.* art. II, § 1, cl. 1.

162.    Congressional delegation of regulatory authority to "private persons" is "legislative delegation in its most obnoxious form."  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Accordingly, while Congress may delegate regulatory authority to other branches in certain

circumstances, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity" at all. *Ass'n of Am. R.R.s. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43 (2015). If Congress makes a private entity part of a governmental regulatory program, the "amount of government oversight of the program" must be "considerable." *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989), *abrogated on other grounds by Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457 (1997). "Congress may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004).

163.    The Authority is a "private, independent, self-regulatory, nonprofit corporation." 15 U.S.C. § 3052(a). It is threatening to prohibit two of the most prominent and long-established horseracing enterprises in the nation from conducting any further horseraces if they do not immediately remit millions of dollars in fees imposed pursuant to an unlawful assessment methodology. It is threatening to do so not by commencing a civil action in federal court to compel payment, as Congress intended, but through its own internal disciplinary processes (which Congress intended to be reserved for safety and medication-control violations).

164.    The Authority is doing all this without the prior approval of any governmental official or employee.

165.    Moreover, a decision of a 3-member panel of the Authority's Board to ban CDI and NYRA from conducting any further horseraces until they remit millions of dollars in fees would take effect immediately according to the Authority's enforcement rule. Unless, at the party's request, the Board exercises its discretion to stay the Board panel's decision, that decision would

not be stayed while CDI and NYRA pursued an appeal first to the full Board, let alone review by the FTC.  87 Fed. Reg. at 44,402.

166.    By threatening to prohibit CDI and NYRA from conducting horseraces until they remit millions of dollars in fees, the private Authority is wielding quintessentially executive power outside the direction and control of the executive branch.  The Constitution does not permit the Authority to exercise such executive authority outside the government's "'authority and surveillance.'"  *NHBPA*, 107 F.4th at 430.  The private non-delegation doctrine does not permit a private corporation to cloak itself in the power of the federal government and order CDI and NYRA to suspend legitimate business operations if they do not pay millions of dollars in illegally imposed fees.

167.    This Court should therefore declare that the Authority's enforcement actions against CDI and NYRA violate the Constitution's private non-delegation doctrine and enjoin Defendants from taking any further action against CDI or NYRA pursuant to the Act's enforcement provisions, which unconstitutionally permit the private Authority to exercise executive authority outside the supervision and control of the government.

## COUNT EIGHT

### Violation Of The Due Process Clause Of The Fifth Amendment

168.    All preceding paragraphs are incorporated by reference.

169.    The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

170.    It is a fundamental "due process maxim" that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."  *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016).

171.    Yet the private Authority is proposing to serve as the judge of whether CDI and NYRA are liable for millions of dollars in assessed fees by subjecting them to its internal disciplinary process.  The Authority has an obvious personal interest in receiving millions of dollars allegedly necessary to fund its operations, and the almost certainly predetermined outcome of such proceedings before the Authority is glaringly apparent.

172.    The Due Process Clause does not permit Congress to empower the private Authority to decide for itself whether CDI and NYRA should be banned from conducting horseraces until they pay the Authority millions of dollars in assessed fees.

173.    This Court should therefore declare that the Authority's enforcement action against CDI and NYRA through its internal disciplinary process violates the Due Process Clause and enjoin Defendants from taking any action to enforce the Authority's alleged non-payment violations through the Authority's internal disciplinary process.

## PRAYER FOR RELIEF

174.    Plaintiffs demand a judgment against Defendants as follows:

a.    Declaring that the Authority's purse-based assessment methodology violates 15 U.S.C. § 3052(f)(1)(C)(ii)(I);

b.    Declaring that the FTC's approval of the Authority's purse-based assessment methodology was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A);

c.    Declaring that the Authority's imposition of assessments pursuant to its purse-based assessment-methodology rather than its alternative start-based methodology in Rule 8520(g) was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A);

d.      Declaring that Defendants are equitably estopped from enforcing its purse-based assessment methodology against Plaintiffs;

e.      Declaring that the Authority's attempt to collect assessed fees through its internal disciplinary process violates 15 U.S.C. § 3057;

f.      Declaring that the Authority's attempt to collect assessed fees through its internal disciplinary process violates Article III of the Constitution;

g.      Declaring that the Authority's exercise of executive authority outside the government's supervision and control violates the private non-delegation doctrine;

h.      Declaring that the Authority's attempt to collect assessed fees through its internal disciplinary process violates the Due Process Clause of the Constitution;

i.      Enjoining Defendants from (1) taking any actions against Plaintiffs to enforce the unlawful purse-based methodology, or any other unlawful assessment methodology; or (2) taking any action to collect fees from Plaintiffs imposed pursuant to the unlawful purse-based methodology, or any other unlawful assessment methodology;

j.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action;

k.      Awarding Plaintiffs nominal damages; and

l.      Granting such other and further relief as this Court deems just and proper.

Dated:  December 4, 2024

Respectfully submitted,

/s/ *Thomas H. Dupree, Jr.*
THOMAS H. DUPREE JR.
MATTHEW D. MCGILL
LOCHLAN F. SHELFER
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, DC 20036
Phone: (202) 955-8500
E-mail: tdupree@gibsondunn.com