**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CHURCHILL DOWNS INCORPORATED,

        Plaintiff,

    v.

HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC., *et al.*,

        Defendants.

Civil Action No. 3:24-cv-00706-BJB

**CHURCHILL DOWNS' REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................. 3

I.      The Authority's Purse-Based Methodology Violates The Act. ........................... 3

        A.      The Act Requires That Racing Starts Be The Primary Basis For
                Allocating Fees Among The States............................................................. 3

        B.      The Authority's Methodology Is Primarily Based On Purses,
                Not Racing Starts. ...................................................................................... 6

II.     The FTC's Approval Of The Purse-Based Methodology
        Was Arbitrary And Capricious. ........................................................................... 9

III.    It Was Arbitrary And Capricious For The Authority Not To Apply Its Alternative
        Calculation In Rule 8520(g). .............................................................................. 13

        CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024) ................................................................4

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987) .............................................................................12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .............................................................................10

*Dong v. Smithsonian Inst.*,
    125 F.3d 877 (D.C. Cir. 1997) ..............................................................13

*Env't Def. v. Duke Energy Corp.*,
    549 U.S. 561 (2007) ...............................................................................5

*Gould, Inc. v. Mitsui Mining & Smelting Co.*,
    947 F.2d 218 (6th Cir. 1991) ..................................................................6

*Gully v. First Nat'l Bank*,
    299 U.S. 109 (1936) .............................................................................12

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) .............................................................................13

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*,
    617 F. Supp. 3d 478 (W.D. La. 2022) ...................................................13

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023) ...........................................................12, 14

*Prairie Band Potawatomi Nation v. Yellen*,
    63 F.4th 42 (D.C. Cir. 2023) ........................................................4, 6, 10

*Sierra Club v. EPA*,
    356 F.3d 296 (D.C. Cir. 2004) ................................................................4

*Skinner v. Switzer*,
    562 U.S. 521 (2011) ...............................................................................8

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...............................................................................5

**Statutes**

5 U.S.C. § 551(1) ...................................................................................14

15 U.S.C. § 3051(4) ...............................................................................15

15 U.S.C. § 3052(a) ...................................................................................................13

15 U.S.C. § 3052(f)(1)(C)(i) ......................................................................................10

15 U.S.C. § 3052(f)(1)(C)(ii) ................................................................................3, 10

15 U.S.C. § 3052(f)(3)(B) ......................................................................................9, 10

15 U.S.C. § 3053(a) ...................................................................................................13

15 U.S.C. § 3053(c) .....................................................................................................8

15 U.S.C. § 3054(a)(2) ...............................................................................................14

15 U.S.C. § 3054(b) ...................................................................................................14

15 U.S.C. § 3054(*l*)(1) ...............................................................................................15

15 U.S.C. § 3057(c) ...................................................................................................14

15 U.S.C. § 3057(d)(3)(A) .........................................................................................10

15 U.S.C. § 3058(b)(2)(A)(iii) ...................................................................................14

28 U.S.C. § 1605(a)(2) .................................................................................................5

**Regulations**

87 Fed. Reg. 9,349 (Feb. 18, 2022) .............................................................................9

87 Fed. Reg. 67,915 (Nov. 10, 2022) ...................................................................13, 15

**Other Authorities**

Cmt. of Thoroughbred Horsemen's Associations, Inc.,
    https://tinyurl.com/3wybb7f8.........................................................................6, 10

FTC, *Order Approving the Assessment Methodology Rule Modification Proposed
    by the Horseracing Integrity and Safety Authority* (Dec. 23, 2024),
    https://tinyurl.com/5d43tykp...............................................................................11

FTC, *Order Approving the Assessment Methodology Rule Modification Proposed
    by the Horseracing Integrity and Safety Authority* (Jan. 9, 2023),
    https://tinyurl.com/39yjan5h...............................................................................11

FTC, *Order Approving the Assessment Methodology Rule Proposed by the
    Horseracing Integrity and Safety Authority* (Apr. 1, 2022),
    https://tinyurl.com/2n82d6pk.............................................................................6, 9

FTC, *Order Disapproving the Anti-Doping and Medication Control Rule
    Proposed by the Horseracing Integrity and Safety Authority* (Dec. 12, 2022),
    https://tinyurl.com/56zxfbku................................................................................15

HISA, *2025 Assessments by State*, https://tinyurl.com/2tdk2hcr.............................7, 15

*Predominant*, Merriam-Webster, https://tinyurl.com/4wf9abpu ......................................................5

*Primary*, Merriam-Webster, https://tinyurl.com/5ferxfxf...............................................................5

### INTRODUCTION

The Authority Defendants' response to Churchill Downs' Motion for Partial Summary Judgment confirms that there is no genuine dispute of material fact as to these claims and that Churchill Downs is entitled to judgment as a matter of law.

**First**, the Horseracing Integrity and Safety Act (the "Act") requires that the allocation of fees among States be "based on" racing starts, and the law is clear that such a congressional command to a regulator requires that statutory criterion to be the primary basis for action. In the Authority's assessment methodology, however, racing starts are nowhere near the primary basis; instead, starts take a back seat to purses, which act as the primary determinative factor.

The Authority argues that starts need not form the "primary" basis for its methodology because Congress did not use that word, citing cases from inapposite contexts. But in the world of administrative law, it is a hornbook principle that when Congress orders an agency to make a decision "based on" a particular factor, that factor—and not an atextual consideration—must form the primary basis of the agency's decision.

The Authority also insists that its methodology is in fact starts-based because it calculates assessments by dividing a State's share of purses by its share of starts. But that methodology causes the relative assessment to *decrease* as the number of racing starts increases. That is the opposite of what Congress required when it directed the Authority to base each State's share of fees on its number of racing starts: that a State's fees increase as its number of racing starts increases. The Authority also claims that its methodology is primarily starts-based because the starts-based variable is responsible for the majority of fees owed by some States. But the disparate role the Authority's starts-based and purse-based variables play in high-purse and low-purse States proves that the methodology allocates fees primarily on the basis of purses. Everything hinges on

1

the relative size of total purses in a State: the purse-based variable dramatically increases fees in high-purse States and correspondingly reduces fees in low-purse States. Because the Authority's methodology for allocating fees among States is primarily based on each State's share of purses rather than its share of racing starts, it is inconsistent with the Act, and Churchill Downs is entitled to summary judgment on Count I of its Amended Complaint.

*Second*, the Authority contends that the FTC did not act arbitrarily when it approved the purse-based methodology. The Authority says the FTC believed that assessing fees based on each State's ability to pay was consistent with the Act's requirements for proportionality among States and equitable allocation among covered persons within the State. But that justification is based on a misreading of the Act and therefore cannot be a reasonable basis for the FTC's approval decisions. The Act provides that fees are to be proportional among States based on their share of racing starts—not purses—and the equitable allocation requirement applies to *intrastate* apportionment of fees, not the allocation of fees among States. Nor can the Authority defend the FTC's approval decisions on the ground that it reasonably anticipated the Authority's costs would scale with the size of purses. No adequate basis for that expectation appears in the administrative record. And, in any event, it was not reasonable for the FTC to continue approving Authority proposals using the purse-based methodology *after* it had become clear that the Authority's costs were not closely correlated to purses. Churchill Downs is therefore entitled to summary judgment on Count II of its Amended Complaint.

*Third*, the Authority contends that the APA did not require it to comply with its own Rule 8520(g) and apply its starts-based "Alternative Calculation" because it is a private corporation subject to supervision by the FTC. But the APA provides that any entity exercising substantial independent authority under the laws of the United States is an "agency," without regard to whether

that entity is formally public or private or whether it is subject to supervision and review by another agency.    Any other rule would countenance an end-run around the APA's foundational requirements of principled agency lawmaking.    Moreover, Rule 8520(g)'s application is not limited to the particular parties benefitting from an injunction, but extends—in keeping with the Act's paramount goal of uniform enforcement—to all applicable States, racetracks, and covered persons, which means all those who are subject to the Authority's jurisdiction.    Churchill Downs is entitled to summary judgment on Count III.[1]

## ARGUMENT

### I.    The Authority's Purse-Based Methodology Violates The Act.

#### A.    The Act Requires That Racing Starts Be The Primary Basis For Allocating Fees Among The States.

The Act requires that the fees assessed from each State shall "be based on" the "projected amount of covered racing starts for the year in each State." 15 U.S.C. § 3052(f)(1)(C)(ii).    Yet the Authority adopted and the FTC approved an assessment methodology in which fees are largely determined by a non-statutory factor: purses.    Because the number of racing starts in a State is not the primary basis for assessments, the Authority's methodology violates the statute.

In response, the Authority insists that the allocation of fees among the States need not be "'primarily based on' or 'predominantly determined by'" racing starts because Congress did not "expressly" use the words "primarily" or "predominantly."    Dkt. 61, at 4.    According to the Authority, it can comply with Congress's command to base the allocation of fees among States on racing starts simply by ensuring that "[a]s a state's Projected Starts increase its assessment

---

[1] The FTC filed a joinder in the Authority's opposition to Churchill Downs' Cross-Motion for Partial Summary Judgment.  Dkt. 62.  Because the joinder did not make any additional substantive arguments in support of the Authority's purse-based methodology, Churchill Downs' arguments apply with equal force to the FTC's joinder.

increases." *Id.* at 5.  But under the Authority's interpretation, fees could be allocated based entirely on a State's proportionate share of purses, with a penny added for each racing start.  Churchill Downs pointed out this gaping hole in the Authority's logic in its Cross-Motion for Partial Summary Judgment, *see* Dkt. 58, at 15, and the Authority had no response.  It is undeniable that the Authority's interpretation of the statute—that "based on" simply means "take into consideration"—would render Congress's command to base fee allocations on racing starts meaningless, supplanting starts with purses as the primary consideration.

That is not the law.  When "Congress directs an agency to act 'based on' an identified factor, that factor must be" both a "'starting point' *and* 'primary basis'" for the agency action. *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 44 (D.C. Cir. 2023) (emphasis added). By using the term "based on," Congress "prohibit[s] a governmental actor from taking actions" that "supplant" that "decisional criteri[on]"; rather, the agency's action "must be anchored" to the statutory factor.  *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024).  These cases rebut the Authority's contention that Congress does not require an agency to act "primarily" or "predominantly" based on a statutory factor unless it uses those adverbs explicitly.  Dkt. 61, at 4. Courts consistently hold that an instruction that agency action be "based on" a statutory criterion requires that the criterion be the primary basis for the agency's decision, regardless of whether Congress explicitly uses the terms "primarily" or "predominantly."  *See Prairie Band Potawatomi Nation*, 63 F.4th at 44 (requirement to allocate COVID-19 relief funds to tribal governments "based on increased expenditures" means increased expenditures "must be" the "primary basis" for action); *Sierra Club v. EPA*, 356 F.3d 296, 306 (D.C. Cir. 2004) (requirement that Clean Air Act attainment demonstrations be "based on" photochemical grid modeling requires such modeling to be "the primary basis for the attainment demonstration"); *Bridgeport Hosp.*, 108 F.4th

4

at 887 (requirement that wage-index factor be updated "on the basis of a survey" requires the factor to "be anchored to the survey of wages, and not to other policy factors that would abandon or supplant the data-driven metric prescribed by Congress").

In an effort to distinguish these cases, the Authority relies on a manufactured distinction between the phrase "predominant basis" (Dkt. 58, at 10) and the phrase "primary basis," Dkt. 61, at 4. But "predominant" and "primary" are synonyms. *Compare Predominant*, Merriam-Webster, https://tinyurl.com/4wf9abpu (defined as "having superior strength, influence, or authority"), *with Primary*, Merriam-Webster, https://tinyurl.com/5ferxfxf (defined as "of first rank, importance, or value"). Because the Authority's allocation of fees among the States is primarily determined by each State's shares of purses—not starts—starts are neither the primary nor predominant basis for its methodology, and its attempt to distinguish analogous cases is unconvincing.

The Authority relies on cases interpreting the phrase "based on" in fundamentally different contexts, such as jurisdictional and criminal-sentencing statutes, in which "based on" is best interpreted to mean "arising from." Dkt. 61, at 4. Not one of them was an administrative-law case involving a statute directing regulators to act based on certain factors. *See* Dkt. 58, at 15-16 & n.3. "It is a fundamental canon of statutory construction that the words of a statute *must be read in their context* and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (emphasis added). Even the presumption that "identical words" used in "the same act" have the same meaning "readily yields whenever there is … variation in the connection in which the words are used" because terms "may take on distinct characters from association with distinct statutory objects." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). When Congress provides that jurisdiction exists over actions "based upon a commercial activity carried on in the United States by [a] foreign state," 28 U.S.C. § 1605(a)(2), "based upon" means that "the

cause of action *arises from* commercial activity in the United States." *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 947 F.2d 218, 221 (6th Cir. 1991) (emphasis added). But this case arises in the context of an APA claim that the agency did not "bas[e]" its decision "on" the required statutory factor. And in that specific context, courts hold that, when "Congress directs an agency to act 'based on' an identified factor," that "factor must be a 'starting point' and 'primary basis'" for action. *Prairie Band Potawatomi Nation*, 63 F.4th at 44.

**B.    The Authority's Methodology Is Primarily Based On Purses, Not Racing Starts.**

The Authority's methodology is not "based on" racing starts because the amount of purses—not starts—is the primary basis for allocating fees among States. The Authority attempts to recharacterize purses as a starts-based variable by arguing that "every purse is linked to a start." Dkt. 61, at 5. Whereas the amount of purses may have a *link* to the number of racing starts, they are fundamentally different considerations. An allocation of fees that is based on the dollar amount of winnings paid is simply not "based on" the nonmonetary criterion of racing starts (*i.e.*, the number of horses leaving starting gates in covered horseraces).

The Authority next argues that its methodology is based on starts because its purse-based variable is divided by each State's share of racing starts. Dkt. 61, at 5. But dividing a State's share of purses by its share of starts means that a State's share of fees *decreases* "based on having more starts." Dkt. 58, at 12-13 (quoting Cmt. of Thoroughbred Horsemen's Associations, Inc. at 4, https://tinyurl.com/3wybb7f8 ("Thoroughbred Ass'ns Cmt.")). Thus, under the Authority's methodology, the *more* starts a State holds relative to its total purses, the *lower* its share of fees becomes. As the FTC recognized, the Act requires a *direct* relationship between a State's fees and its number of racing starts, mandating that, "[a]s a state's Projected Starts increase its assessment increases." FTC, *Order Approving the Assessment Methodology Rule Proposed by the*

6

*Horseracing Integrity and Safety Authority* 19 (Apr. 1, 2022), https://tinyurl.com/2n82d6pk ("2022 Approval Order"). Yet dividing a State's share of purses by its share of starts creates an inverse relationship between a State's fees and number of starts, the *opposite* of what the Act requires. Churchill Downs explained this key point in its Cross-Motion for Partial Summary Judgement, Dkt. 58, at 12-13, and the Authority has mustered no response.

The Authority notes that the starts-only variable accounts for more than half the amounts owed by some of Kentucky's neighboring States with low purse amounts. Dkt. 61, at 5-6. This does not save the Authority's purse-based methodology. It is not surprising that the starts-based variable is responsible for a greater share of the amounts owed in States with a relatively high number of racing starts but a relatively low amount of purses. The three States identified by the Authority—Illinois, Indiana, and Ohio—account for 17.2% of national racing starts but only 10% of national purses. HISA, *2025 Assessments by State*, https://tinyurl.com/2tdk2hcr ("2025 Assessments by State"). Indeed, the disparate role the Authority's purse-based variable plays in high-purse versus low-purse States further demonstrates that the Authority's methodology allocates fees primarily on the basis of purses rather than starts: The purse-based variable is high and dramatically inflates amounts owed in high-purse States but is low in low-purse States and reduces their amounts owed. For example, under the purse-based methodology, Ohio is responsible for about 6.7% and Kentucky for about 15% of the Authority's total fees for 2025. *Id.* Those proportionate shares are closer to each State's share of purses (5.1% for Ohio and 19.4% for Kentucky) than to their share of racing starts (9.0% for Ohio and 10.1% for Kentucky). *Id.* Because the Authority adopted—and the FTC approved—a methodology in which each State's share of fees more closely tracks its share of purses than its share of racing starts, racing starts cannot be said to be the primary basis on which fees are allocated.

The Authority also relies on Congress's instruction to the FTC to approve the Authority's rules so long as they are "consistent with" the Act. Dkt. 61, at 7 (quoting 15 U.S.C. § 3053(c)). But Churchill Downs' argument is that the Authority's assessment methodology *violates* the Act. Because the Authority's purse-based assessment methodology is inconsistent with the Act's requirement that the Authority's fees be allocated among the States based on the number of racing starts in each State, the Act's consistency-review provision required the FTC to disapprove it.

Finally, the Authority faults Churchill Downs for not articulating its precise legal argument—that the statutory factor of racing starts need not be the sole variable for allocating fees, but must be the primary and predominant factor—in its Amended Complaint. Dkt. 61, at 3. But "a complaint need not pin [a] plaintiff's claim for relief to a precise legal theory," and Rule 8 "requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Churchill Downs' Amended Complaint explained that the Authority's inclusion of the non-statutory criterion of purses in its assessment methodology is inconsistent with the Act's requirement that fees be allocated based on racing starts, Am. Compl. ¶¶ 124-29, and Churchill Downs elaborated its legal argument for why that is so in its Opposition to the Authority's Motion to Dismiss and Cross-Motion for Partial Summary Judgment, Dkts. 57, 58. That is routine practice in civil litigation. Churchill Downs certainly did not concede that the Authority's purse-based methodology is consistent with the Act, Dkt. 61, at 3, by arguing—correctly—that the phrase "based on" requires that the statutorily identified factor be the primary basis for agency action, and that racing starts are not the primary basis for the Authority's allocation of fees among States, Dkt. 58, at 13.

Furthermore, it is the Authority that has shifted its theory of how its purse-based methodology is consistent with the Act. The Authority told the FTC that it adopted a purse-based

methodology for allocating fees *among States* because it was "guided by" the Act's requirement to "allocate equitably" each State's share of fees among covered persons *within each State*. 87 Fed. Reg. 9,349, 9,350 (Feb. 18, 2022); 15 U.S.C. § 3052(f)(3)(B). Now, the Authority backs away from its misplaced reliance on a statutory provision governing *intrastate* allocations of fees to justify its adoption of a purse-based *interstate* allocation of fees that it viewed as a more equitable methodology than the one Congress provided, and instead points to the FTC's approval order as "the relevant decision." Dkt. 61, at 7 n.3.

Because the Authority's purse-based assessment methodology is inconsistent with the Act's requirement that allocation of fees among States be "based on" racing starts, the Court should grant Churchill Downs summary judgment on Count I of its Amended Complaint.

## II.    The FTC's Approval Of The Purse-Based Methodology Was Arbitrary And Capricious.

The FTC's approval of the Authority's purse-based methodology must be set aside under the APA for the additional reason that it results in arbitrary and inequitable fee disparities among different States and racetracks.

The Authority insists that it was reasonable for the FTC to approve a methodology allocating fees among States primarily on the basis of purses because States with higher purses likely have racetracks with more funds available (though high-purse States may also include low-purse tracks that will have a reduced ability to pay). Dkt. 61, at 8. The Authority notes that the FTC accepted this rationale on the purported ground that it was faithful to the Act's "equitable allocation among Covered Persons *within each State*." 2022 Approval Order, at 10 (quoting 87 Fed. Reg. at 9,350 n.14) (emphasis added).

But this explanation only underscores the *unreasonableness* of the FTC's decisions to approve the Authority's purse-based methodology. It was not reasonable for the FTC to approve

a purse-based methodology based on the Act's reference to each "State's proportionate share" of fees because the Act explicitly sets forth the basis on which fees are to be proportionate: their share of racing starts, not purses. 15 U.S.C. § 3052(f)(1)(C)(i)-(ii); *see* Dkt. 58, at 11-12. Nor was it reasonable for the FTC to rely on the Act's requirement for equitable allocation of a State's share of fees among covered persons *within each State* to approve a purse-based allocation *among States* that flies in the face of the Act's text. *See* 15 U.S.C. § 3052(f)(3)(B). It was arbitrary and capricious for the FTC to adopt a purse-based, ability-to-pay allocation of fees among States that it justified based on a misreading of the Act's requirements.

The Authority says it anticipated that horses in stakes races would be subject to higher testing costs and that drug disqualifications in stakes races would result in higher enforcement costs. Dkt. 61, at 8-9. But given that "each horse will need to be tested" before a horserace— stakes race or not—to ensure that the race is conducted fairly, the Authority did not explain why it expected that horses in high-purse stakes races would be subjected to more vigorous testing. Thoroughbred Ass'ns Cmt. 8. Nor did the Authority explain why it believed that drug disqualifications in high-purse races would result in greater enforcement costs than in low-purse races. Covered persons in both high- and low-purse races are subject to "monetary fines and penalties" as well as suspensions or even "lifetime bans from horseracing," which are all powerful incentives to challenge drug disqualifications regardless of the size of purses. 15 U.S.C. § 3057(d)(3)(A). The Authority now asserts that it was reasonable to expect that covered persons facing disqualification in high-purse races "would seek additional testing." Dkt. 61, at 9. But the Authority did not provide this explanation in the administrative record. An agency's explanation for its action "must be based on the administrative record and not provided as a *post-hoc* rationalization." *Prairie Band Potawatomi Nation*, 63 F.4th at 46 (citing *Citizens to Pres. Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)).

Even if it were reasonable for the FTC to have approved the Authority's purse-based methodology in April 2022—and it was not—it was not reasonable for the FTC to *continue approving* the Authority's proposals retaining that methodology *after* it had become clear that the Authority's costs did *not* scale with the size of purses and that the purse-based methodology was resulting in arbitrary and inequitable fee disparities. Dkt. 58, at 18. Shortly after the purse-based methodology went into effect, it quickly became clear that "States with fewer annual racing starts" were paying "larger fees than States with more annual racing starts"—which the Authority concedes to be an "acknowledged result." Dkt. 48, at 18 (quoting Am. Compl. ¶ 133). The methodology also resulted in "widely disparate per-start fees among different racetracks" that could not be justified even based on the sizes of purses, let alone the number of racing starts. Am. Compl. ¶ 110; *see* Dkt. 58, at 17-18.

Yet the FTC nevertheless continued approving rule proposals retaining the purse-based methodology, first in January 2023, and then again in December 2024. FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* (Jan. 9, 2023), https://tinyurl.com/39yjan5h; FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* (Dec. 23, 2024), https://tinyurl.com/5d43tykp. It was arbitrary and capricious for the FTC to continue approving a purse-based methodology after the facts on the ground had debunked the Authority's theory that its costs would scale with the size of purses and had vindicated commenters' predictions that the methodology would result in arbitrary and unfair fee disparities between States and racetracks. The Authority cannot defend as reasonable the FTC's 2023 and 2024 reapprovals of the purse-based methodology on the ground that the FTC acted reasonably based on the evidence

before it in April 2022.  Dkt. 61, at 9-10.  Once "hindsight" in January 2023 and December 2024 had shown that the proffered justifications for the purse-based methodology were misplaced, *id.*, the FTC should have disapproved the Authority's proposals retaining its purse-based methodology.  At the very least, the FTC should have rejected the Authority's methodology by preparing preemptive modifications—a power that the Sixth Circuit had held the FTC possessed, *see Oklahoma v. United States*, 62 F.4th 221, 232 (6th Cir. 2023), *judgment vacated*, No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025).

The Authority criticizes Churchill Downs for not arguing in its Amended Complaint that the FTC should have preemptively modified the Authority's purse-based methodology.  Dkt. 61, at 10 n.5.  But again, Churchill Downs was not required to raise this argument in its Amended Complaint.  This argument is not an independent challenge; rather, it rebuts the Authority's defense of the FTC's decisions.  A "properly pleaded complaint" is required to provide only "a statement of the plaintiff's cause of action" and need not "anticipat[e] or repl[y] to a probable defense."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Gully v. First Nat'l Bank*, 299 U.S. 109, 113 (1936).  Churchill Downs alleged in its Amended Complaint that the FTC's decisions to approve the Authority's purse-based methodology were arbitrary and capricious in violation of the APA.  Am. Compl. ¶¶ 130-34.  The Authority or FTC might have defended the FTC's approval decisions on the ground that the Act required the FTC's approval even if the FTC viewed the methodology as inequitable.  To head off that argument, Churchill Downs explained that it was unreasonable for the FTC to approve the purse-based methodology without preparing preemptive modifications.  Thus, to the extent the Authority and FTC argue that the Act *required* the FTC to approve the purse-based methodology, it was arbitrary and capricious for the FTC to do so without at the very least exercising its power to prepare preemptive modifications.

This Court should therefore grant summary judgment to Churchill Downs on Count II of its Amended Complaint.

### III.    It Was Arbitrary And Capricious For The Authority Not To Apply Its Alternative Calculation In Rule 8520(g).

It was also arbitrary and capricious for the Authority not to apply its starts-based Alternative Calculation in Rule 8520(g) given that the Western District of Louisiana has "issue[d] an injunction that enjoins the enforcement" of the assessment methodology "based on the use of Projected Purse Starts."   87 Fed. Reg. 67,915, 67,919 (Nov. 10, 2022); *see Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 498, 502 (W.D. La. 2022).

The Authority reprises its threshold argument that the APA does not apply to it because Congress has characterized the Authority as a "private, independent, self-regulatory, nonprofit corporation."   Dkt. 61, at 11 (quoting 15 U.S.C. § 3052(a)).   But, unlike Amtrak, whose "authorizing statute declare[d] that it 'will not be an agency,'" *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 391 (1995), the Act does not similarly state that the Authority is not an agency of the United States.   Nor does the Authority cite any support for the proposition that an "entity exercis[ing] substantial independent authority" under the laws of the United States is not an "agency" simply because it is a private corporation.   *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 879, 881 (D.C. Cir. 1997) (applying the "substantial independent authority" test to the Smithsonian even though it is "not an establishment in the executive branch").   Congress vested the Authority with rulemaking power and provided that the rulemaking process would be governed by FTC regulations "under section 553 of Title 5"—*i.e.*, the APA.  15 U.S.C. § 3053(a).   The Authority cannot exercise delegated rulemaking authority that Congress intended to be subject to the limits of the APA while simultaneously disclaiming any need to adhere to the APA's requirement that a regulator follow its own regulations.

13

The Authority has no persuasive response to Churchill Downs' argument that the Authority exercises "substantial independent authority" under the laws of the United States. *See* Dkt. 58, at 20. The Authority concedes (at 11) that it "exercises independent and exclusive national authority" over racetrack safety and medication control, 15 U.S.C. § 3054(a)(2); makes binding rules of general application that preempt state law, *id.* § 3054(b); and determines the rights and duties of covered persons in binding orders, *id.* § 3057(c). The Authority nevertheless contends that its exercise of such substantial independent authority does not render it an "agency" under the APA because the Sixth Circuit has held that the Authority is subject to "'pervasive' oversight and control" by the FTC for purposes of the Constitution's private nondelegation doctrine. Dkt. 61, at 11 (quoting *Oklahoma*, 62 F.4th at 231). But the Sixth Circuit's decision has no bearing on the Authority's status as an "agency" under the APA, which includes any "authority of the Government of the United States, *whether or not* it is within or subject to review by another agency." 5 U.S.C. § 551(1) (emphasis added). The Authority is an "agency" subject to the APA. Indeed, any other conclusion would allow the FTC and Authority to evade the fundamental tenet of administrative lawmaking that regulators must abide by their own regulations. In any event, even if the Authority were not an "agency" under the APA, it is still required to act "in accordance with law," including FTC-approved rules like Rule 8520(g). 15 U.S.C. § 3058(b)(2)(A)(iii).

On the merits, the Authority renews its argument that Rule 8520(g)'s statement that the Alternative Calculation applies to "applicable States, Racetracks, and Covered Persons, as the case may be" means that the Alternative Calculation applies only to the particular parties to an order enjoining the purse-based methodology. Dkt. 61, at 11-12 (emphasis omitted). Contrary to the Authority's argument (at 12), Churchill Downs did *not* argue that "applicable" means *all* States, racetracks, and covered persons; rather, that phrase means all States, racetracks, and covered

14

persons *subject to the Authority's jurisdiction*. Dkt. 58, at 20. Only 19 States are currently subject to the Authority's jurisdiction. 2025 Assessments by State. And, as a default rule, the Act extends the Authority's jurisdiction only to racetracks conducting Thoroughbred horseraces. *See* 15 U.S.C. §§ 3051(4), 3054(*l*)(1). Accordingly, the Alternative Calculation in Rule 8520(g) does not apply to *all* States and racetracks but only to the "applicable" States and racetracks within the Authority's jurisdiction "as the case may be," (*e.g.*, depending on whether a State has elected to expand the Authority's jurisdiction to include additional racehorse breeds). 87 Fed. Reg. at 67,919.

Nor does the timing of the adoption of Rule 8520(g) after the entry of the injunction in the *Louisiana* case indicate that the Alternative Calculation was intended to apply only to particular parties benefitting from an injunction. Indeed, such a narrow rule would depart from the "bedrock principle of the Act" that there is a "need for uniformity" in the regulation of horseracing. FTC, *Order Disapproving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority* 1 (Dec. 12, 2022), https://tinyurl.com/56zxfbku. To the contrary, it makes perfect sense that the Authority would adopt an Alternative Calculation that allowed it to continue to collect fees on a uniform basis in the event its purse-based methodology were enjoined by a court, while preserving the opportunity to return to uniform enforcement of its purse-based methodology in the event the "injunction is reversed by a court of competent jurisdiction and such reversal is final and non-appealable." 87 Fed. Reg. at 67,919.

This Court should accordingly grant summary judgment to Churchill Downs on Count III of its Amended Complaint.

## CONCLUSION

For these reasons, Churchill Downs respectfully requests that this Court grant it partial summary judgment on Counts I-III of its Amended Complaint.

Dated: July 1, 2025

Respectfully submitted,

_/s/ Thomas H. Dupree, Jr._
THOMAS H. DUPREE JR.
LOCHLAN F. SHELFER
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, DC 20036
Phone: (202) 955-8500
E-mail: tdupree@gibsondunn.com