UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHURCHILL DOWNS, INC.                                                    PLAINTIFF

v.                                                              No. 3:24-cv-706-BJB

HORSERACING INTEGRITY AND SAFETY                      DEFENDANTS
AUTHORITY, INC., ET AL.

* * * * *

OPINION & ORDER GRANTING MOTION TO DISMISS IN PART AND GRANTING
SUMMARY JUDGMENT IN PART

May a private corporation, endowed with governmental power but lacking its representative character, fund itself by dunning regulated entities with fees "based on" whatever factors it deems appropriate?

The Horseracing Integrity and Safety Authority was born six years ago, when Congress endeavored to spread a layer of uniform federal rules across a patchwork of State practices that, according to critics, spurred a race to the regulatory bottom. Rather than task a federal law-enforcement or administrative agency with this responsibility, however, the Horseracing Act created the "Authority," a private corporation sometimes called "HISA," to do the job. *See* Pub. L. No. 116-260, tit. XII, 134 Stat. 1182, 3252 (2020).

The Authority sits outside the contours of Article II, answering to a board rather than the President or a principal officer. Yet it enjoys the power to make and enforce legislative rules for the industry—and fills its coffers not through appropriations but by assessing fees against those it regulates. This unusual structure immediately provoked constitutional challenges across the land.

This case poses a time-limited question that is—at least on the surface—merely financial. Churchill Downs, Inc., challenges not whether the Authority can lawfully regulate, but instead how it may procure funding for those regulatory activities.

Congress authorized the Authority to reimburse its own costs through the States "based on" their number of racing starts and their proportionate share of the Authority's costs. 15 U.S.C. § 3052(f)(1)(C)(i), (ii). The Authority opted to allocate these fees on an "equitably"—based not only on starts, but also on purse sizes, which it viewed as a proxy for which States' racing outfits could or should pay more.

1

Churchill Downs—a large track in a State that pays disproportionately large purses—objected that this "purse-weighted" methodology reflected an error of judgment and of law. The Horseracing Act, Churchill maintains, leaves little if any room for consideration of purse sizes..

Given its objections to the legality of the method, Churchill Downs refused to pay its full assessment for 2023, 2024, and 2025 and instead filed this lawsuit..

It raises several claims, including that the Authority's CEO promised not to collect during litigation, that the Authority already unjustly extracted a benefit of sorts from Churchill that it shouldn't be allowed to keep, and that the Authority somehow inadvertently already enacted Churchill's preferred rule. These contentions fail. But Churchill is right that Congress hasn't given the Authority freewheeling license to redistribute costs based only its own notions of fairness—or any number of other considerations, so long as "racing starts" remains among them. And the Authority's alternative justification for its formula—that purse sizes could serve as reasonable proxies for its own operating costs—bears at least a colorable connection to the statute. But it, too, ignores the principle espoused by Congress: the Authority must allocate its costs to States on a proportionate basis according to the State's share of drug-testing and track-safety costs. For that reason, the Authority's interstate purse-weighted assessment formula is unlawful.

## BACKGROUND

### I.    Statutory Background

Thoroughbred horseracing historically relied on a patchwork system of state-by-state regulation. *See Oklahoma v. United States*, 163 F.4th 294, 301 (6th Cir. 2025). But after a series of high-profile drug disqualifications and equine injuries, Congress decided in 2020 to intervene, creating the Authority "to centralize the regulation of thoroughbred racing." *Id.* As a "private, independent, self-regulatory, nonprofit corporation," the Authority is tasked with "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." 15 U.S.C. § 3052(a); *see also* § 3054(a)(2) (giving HISA "independent and exclusive national authority over … safety, welfare, and integrity" of "covered" horseracing). This unique design drew on the existing model of self-regulatory organizations found in federal regulation of securities law. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 424 (5th Cir. 2024), *cert. granted, judgment vacated sub nom. Texas v. Black*, 145 S. Ct. 2835 (2025).

2

To carry out those programs, Congress empowered the Authority and its nine-member Board of Governors[1] to propose rules and enforce them across the industry. *See* 15 U.S.C. §§ 3052–60. Does this congressional decision unconstitutionally vest lawmaking and police power in a private corporation? No. "[A] private entity may *aid* a public agency," the Sixth Circuit has explained—at no small risk of understatement, "so long as the agency retains ultimate authority over the implementation of the federal law." *Oklahoma II*, 163 F.4th at 306 (emphasis added). And consistent with that rule, the Authority is subject to FTC oversight at every step of the process; the Commission "is in charge and … has the final say." *Id.* at 308. So the Authority may "draft proposed rules," but "[n]o such proposal becomes a binding rule until the FTC approves it." *Id.* (citing § 3053(c)(2)). Even after approval, the Commission retains the power to make its own rules that "abrogate, add to, and modify [HISA's] rules." *Id.* (quoting 15 U.S.C. § 3053(e)). So too in the enforcement context: "The Authority's adjudication decisions do not become final until the FTC has the opportunity to review them." *Id.* at 311 (citing *Federal Communications Commission v. Consumers' Research*, 606 U.S. 656, 693 (2025)). And "[i]f the Authority tries to implement a sanction before the FTC finally reviews it, the FTC … may stay the sanction." *Id.*

Central to this case, the Authority draws its funding not from congressional appropriations but from fees assessed against the entities it regulates. 15 U.S.C. § 3052(f). Each year, the Authority must "determine and provide to each State racing commission the estimated amount required from the State." § 3052(f)(1)(C)(i). Congress stopped short of prescribing an *exact* formula—directing instead that the Authority propose rules "relating to a formula or methodology for determining assessments described in section 3052(f) of this title." § 3053(a)(11).[2] But although

---

[1] Five members must be "selected from outside the equine industry," and four "from among the various equine constituencies." § 3052(b)(1)(A), (B). A "nominating committee," itself consisting of "seven independent members … from business, sports, and academia," must "select the initial members" and "recommend" prospective members for the Authority's board. § 3052(d)(1), (3). By rule, the Authority establishes procedures for confirming nominees to fill vacancies. § 3052(d)(1)(C).

[2] Churchill Downs and the Authority both referred in the hearing to this formula as the "interstate" methodology, distinct from the "intrastate" methodology that distributes a calculated statewide assessment among regulated entities within a specific state. *See* Transcript of Hearing (DN 73) at 39:11 (Churchill's counsel), 62:6 (HISA's counsel). In the motions currently before the Court, Churchill's statutory and administrative-law challenges apply only to the *interstate* methodology and the Authority's calculations of those state-by-state assessments. *Id.* at 39:10–14.

Congress gave the Authority leeway to propose formulae, it specified two key instructions. First, it must estimate the amounts "required from the State—

  (I)   to fund the State's proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year; and
  (II)  to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year."

§ 3052(f)(1)(C)(i). Second, "[t]he amounts calculated under clause (i) shall—

  (I)   be based on
        (aa)  the annual budget of the Authority for the following calendar year, as approved by the Board; and
        (bb)  the projected amount of covered racing starts for the year in each State; and
  (II)  take into account other sources of Authority revenue."

§ 3052(f)(1)(C)(ii).

After the Authority proposes its fee-assessment rule, the Commission must publish it for notice and comment in the *Federal Register*, as with most other informal rulemaking. Then, after receiving and reviewing comments, the Commission "shall approve" the rule—like all other HISA rulemaking proposals—if it determines the rule is "consistent with" the statute and any other applicable FTC rules. § 3053(c)(2). *See also* § 3053(e) (FTC retains discretion to "abrogate, add to, and modify" HISA rules through its own informal rulemaking process).

Once the Authority calculates assessments for the 38 states[3] within its jurisdiction, states settle up in either of two ways. The state racing commission can choose to "remit" fees straight to the Authority and manage its own collection process, enjoying leeway to allocate the bill as it sees fit among the various regulated entities in its paddock. § 3052(f)(2)(A), (D).[4] Or a racing commission can instead leave the

---

[3] Two states—Louisiana and West Virginia—currently lie beyond the Authority's regulatory reach, at least as a practical matter, thanks to a district court order from Louisiana enjoining the Authority's entire enforcement scheme with respect to those State-plaintiffs. *See* Hearing Transcript at 7:2–8:12.

[4] Although Congress leaves the specifics to the States choosing this option, the statute does provide a non-exhaustive list of the sort of factors a State might consider when distributing the assessment, "such as foal registration fees, sales contributions, starter fees, and track fees." 15 U.S.C. § 3052(f)(2)(D). These factors—which presumably *could* lead to higher bills for deeper-pocketed entities—mirror the Authority's requirement to "allocate

4

allocation to the Authority.  For those States, the Authority must itself "allocate" the State's total bill "among covered persons involved with covered horseraces"—and must do so "equitably."  § 3052(f)(3)(B).[5]  Like the Authority's interstate assessment methodology, its intrastate methodology must be developed through rulemaking.  § 3053(a)(11).

## II.   Regulatory Background

The Authority proposed its first interstate purse-weighted methodology in January 2022.  The Commission published it in the *Federal Register* a month later.  *See* 87 Fed. Reg. 9349 (Feb. 18, 2022).[6]

Under this proposal, the Authority would calculate each State's proportionate share of the Authority's annual budget using a two-variable formula that turned on "the number of projected starts" in a State and "the size of the purses in the … State." 87 Fed. Reg. at 9350.  The purse variable "is derived from taking the total amount of purses in the State and dividing that amount by the number of projected starts."  *Id.* By adding one-half of the pure-starts calculation to one-half of the purse-size calculation, the Authority proposed to assess fees by weighting a State's number of racing starts by the size of its purses.  *See id.* at 9352.  Or, translated to algebraic:

$$State\ starts \times \left\{ .5 \left( \frac{national\ costs}{national\ starts} \right) + \left[ .5 \left( \frac{national\ costs}{national\ starts} \right) \times \frac{\left( \frac{State\ purses\ for\ state\ starts}{national\ purses\ for\ national\ starts} \right)}{\left( \frac{State\ starts}{national\ starts} \right)} \right] \right\} = State\ fees$$

HISA Motion to Dismiss at 8.

This proposal immediately faced industry criticism.  Assessing fees based on purses, rather than just racing starts, ran afoul of the statutory mandate to assess fees "based on … racing starts."[7]  The purse-weighted methodology would "rewar[d]

---

equitably" through its *intra*state methodology for States who *don't* choose to remit fees.  *See* § 3052(f)(3)(B).

[5] Congress defines "covered persons" to mean "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses."  § 3051(6).

[6] The proposed rule also included a formula for the intrastate methodology the Authority uses to assess costs across Covered Persons *within* States that elect not to collect assessments themselves.  But that intrastate equation matters little to this challenge to the interstate formula.  *See* above at n.1.

[7] Comment of Thoroughbred Horsemen's Ass'ns, Inc., et al., No. FTC-2022-14-10, at 5 (Mar. 4, 2022).  *See also* Comment of Amy Cook, Exec. Dir. of Tex. Racing Comm'n, No. FTC-2022-14-6, at 4–6 (Mar. 4, 2022); Comment of N.Y. Thoroughbred Horsemen's Ass'n, et al.,

poor purse structure and over-racing the horse population."[8]  It would require some States  to "subsidize" others and distribute costs unfairly.[9]  And neither evidence nor explanation supported a connection between purse sizes and proportionate State shares of HISA's projected costs.[10]

After the notice-and-comment period, the Commission "reviewed the Act's text, the proposed rule's text and the Authority's explanation contained in the Notice, the Authority's supporting documentation, ten public comments, and the Authority's response to those comments."  FTC, *Order Approving the Assessment Methodology Rule Proposed by the Horseracing Integrity and Safety Authority* at 2 (Apr. 1, 2022) (FTC April 2022 Order).[11]  The Commission adopted the rule in full as "consistent with" the statute and that agency's other rules.  *Id.* at 25.

This didn't end the controversy, however.  One group of industry plaintiffs, led by the States of Louisiana and West Virginia, sued in June 2022, asking the U.S. District Court for the Western District of Louisiana to enjoin the Rule.  Another group sought similar relief in the Eastern District of Arkansas, a third in the Northern District of Texas, and a fourth in the Eastern District of Kentucky.[12]  Some challengers focused on the Authority's proposed funding rule; others Congress' allegedly unconstitutional delegation of public powers to a private corporation.

While this litigation continued, later in 2022 the Authority proposed another rule tweaking the interstate assessment methodology.  *See* 87 Fed. Reg. 67915 (Nov. 10, 2022).  It preserved the purse-weighted methodology, but (as relevant) added a

---

No. FTC-2022-14-13, at 4 (Mar. 4, 2022); Comment of Fla. Horsemen's Benevolent & Protective Ass'n, No. FTC-2022-14-7, at 2 (Mar. 4, 2022).

[8] Comment of Deena Pitman, Exec. Dir. of Indiana Horse Racing Comm'n, No. FTC-2022-14-12, at 1 (Mar. 4, 2022).

[9] *Id.  See also* Comment of Amy Cook at 3–4; Comment of N.Y. Ass'n, et al., at 4–5; Comment of Fla. Ass'n at 3.

[10] *See, e.g.*, Comment of Fla. Ass'n, at 2–3; Comment of Thoroughbred Horsemen's Ass'ns, et al., at 8; Comment of N.Y. Ass'n, et al., at 4–5.

[11] Perhaps illustrating the breadth of pushback contained in the comments, the Authority noted that "[c]uriously," two State racing commission commenters "advance a statutory interpretation that will result in *higher* fees allocated to their states."  Letter from John C. Roach, Counsel, Horseracing Integ. & Safety Auth., to April J. Tabor, Sec'y, Fed. Trade Comm'n, at 3 n.10 (Mar. 14, 2022) (emphasis added).

[12] *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478 (W.D. La. 2022); *Walmsley v. F.T.C.*, No. 3:23-cv-81 (E.D. Ark.); *National Horsemen's Benevolent & Protective Ass'n v. Black*, 596 F. Supp. 3d 691 (N.D. Tex. 2022); *Oklahoma v. United States*, No. 5:21-cv-104, 2022 WL 1913419 (E.D. Ky. June 3, 2022).

fallback methodology applicable if the "court challenges" succeeded in enjoining "the use of Projected Purse Starts in [the interstate] Assessment Methodology." *Id.* This alternative interstate methodology would spring upon the issuance of an injunction for "the applicable States … as the case may be." *Id.* And it would calculate State assessments based exclusively on starts—that is, "the applicable State's respective percentage of Projected Starts." *Id.* In other words, the new language "operates as a savings clause and ensures that [an] Assessment Methodology will continue to operate during any court challenges." *Id.* at 67916. Unlike the initial 2022 funding rule, this one drew little administrative attention—"[o]nly two comments," with "neither related to [the funding] proposal." FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* at 2–3 (Jan. 9, 2023). The FTC eventually adopted the rule in full. *Id.* at 6.

Developments within the Fifth Circuit, meanwhile, disrupted the orderly and uniform implementation of the Interstate Assessment Rule. Three months after the Commissioners adopted the Authority's proposed purse-weighted methodology—and before the addition of the savings clause—the Western District of Louisiana enjoined the Authority from enforcing fee assessments calculated using the purse-weighted, at least within "the States of Louisiana and West Virginia, … as to all Plaintiffs in [that] proceeding." *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 502 (W.D. La. 2022). And in separate litigation, other challengers persuaded the Fifth Circuit that *all* of HISA's enforcement actions were unlawful because Congress had unconstitutionally delegated government power to the Authority, a private corporation. *See National Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 430 (5th Cir. 2024). *See also National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 890 (5th Cir. 2022) (reaching a similar conclusion concerning rulemaking power under an old version of the statute).

Almost simultaneously, the Sixth and Eighth Circuits came out the other way on the private nondelegation challenge. *See Walmsley v. Federal Trade Commission*, 117 F.4th 1032, 1039 (8th Cir. 2024); *Oklahoma v. United States*, 62 F.4th 221, 230–31 (6th Cir. 2023). The Supreme Court vacated all three decisions following *F.C.C. v. Consumers' Research*, 606 U.S. 656 (2025)—but not before the Fifth Circuit remanded the *Louisiana* funding case with the injunction still in place. Since then, the federal trial judge in Louisiana has not acted—apparently awaiting the Fifth Circuit's decision on remand following the *Consumers' Research* vacatur. *See* Motions Hr'g Tr. (DN 73) at 6–7 ("That [*Louisiana* decision] is still stayed."). And, closer to home, the Sixth Circuit has reaffirmed its prior holding that the Horseracing Act avoids private nondelegation problems. *See Oklahoma II*, 163 F.4th at 301.

Two years after proposing the purse-weighted methodology, HISA abandoned it. *See* 89 Fed. Reg. 84600 (Oct. 23, 2024). Its replacement? The starts-only formula

advanced by Churchill in this litigation. *See id.* at 84602 ("[B]eginning January 1, 2026, the Cost Methodology Rule will calculate the assessment solely based on Projected Starts."). As the Authority's notice candidly acknowledged, "numerous stakeholders ha[d] initiated litigation against the Authority over the use of paid purses," including "many" who "benefit from the use of purses in the assessment formula but nevertheless believe that actual starts should be the sole basis for calculating the assessments." *Id.* at 84603. The Authority admitted that its "[a]ctual experience … ha[d] shown [its purse-indexed] budgetary predictions did not come to fruition." *Id.* at 84602. "Quite simply, the Authority's expenses … turned out to be closely correlated to starts and not to purse amounts or the grade of a race." *Id.* at 84603. Starts alone, the Authority had concluded, was "the most appropriate and equitable approach" after all. *Id.*

In response to comments, the FTC simply concluded that the proposed rule cannot be "inconsistent with the Act simply because the Authority chooses to rely *solely* on the basis identified in the statute." FTC, *Order Approving the Assessment Methodology Rule Modification Proposed by the Horseracing Integrity and Safety Authority* at 14 (Dec. 23, 2024). So the Commissioners again adopted the rule in full, *id.* at 24, eliminating the purse variable as of January 1, 2026.

## III.    This Litigation

Although the Authority's new rule has abandoned the purse variable, the effects (which is to say costs) of the old rule linger. Between 2023 and 2024, the Authority assessed Churchill based on purse-weighted starts, but Churchill paid only the portion based on the starts-only formula.

In Churchill's telling, its lower payments were justified for at least two reasons. It "declined" to pay the purse-weighted fees because it believed purse-weighting was inconsistent with Congress' scheme and unlawfully implemented by the Authority and Commission. And its CEO reached an armistice with the Authority's CEO, in which the Authority "agreed to accept payment on the basis of pure starts until such time as that legal question is resolved by the courts." *See* Amended Complaint ¶¶ 112–15.

The calm broke in September 2024 when the Authority told Churchill "that if it did not pay the 'outstanding balance' due under the Authority's purse-based methodology, the Authority would 'have no choice but to pursue an enforcement action for payment before the HISA Board.'" ¶ 116. Two months later, the Authority charged Churchill with violating the Rule through serial underpayment and threatened to suspend racing at Churchill Downs and Ellis Park (owned by Churchill Downs, Inc.) unless the company paid its outstanding balance of $1,905,142. ¶ 120. Churchill responded with this lawsuit, which implicates that outstanding balance

and any unpaid fees accrued under the purse-weighted methodology since November 2024.

The pending motions involve Churchill's first five claims.  First, that the 2023–25 interstate methodology is inconsistent with the statutory requirement that state fees are based on starts and not purses.  Second, that the 2023–25 interstate-assessment rules were arbitrary and capricious because each relied on an unexplained and illogical purse-weighted methodology.  Each claim seeks a declaration adopting Churchill's interpretation of the statute to exclude the Authority's purse-weighted position. Counsel agree that would negate the Authority's efforts to collect purse-weighted fees for those years.

The third count reflects Churchill's (and the Authority's) fallback position. Churchill asserts that the savings clause adopted by the FTC in January 2023 has applied to it ever since, given that a federal district court in Louisiana had previously enjoined use of the purse variable.  *See* Amended Complaint ¶ 136 (citing *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478 (W.D. La. 2022)). Although Churchill was not a party to that lawsuit, it argues the savings clause must be read broadly and applied universally so long as the rule remains enjoined somewhere.  *See* Churchill's Response and Cross-MSJ at 19–20 (citing 87 Fed. Reg. at 67919).

The fourth and fifth counts, meanwhile, assert that even if the Authority's rule withstands APA scrutiny, common-law doctrines of estoppel and quasi-contract authorize the Court to enjoin the Authority's efforts to collect.

## ANALYSIS

### I.   Interpretation of the Horseracing Act

Churchill's first count argues that the Authority's purse-weighted methodology "is inconsistent with" the text of the Horseracing Act, 15 U.S.C. § 3052(f)(1)(C)(ii)(I). Amended Complaint ¶ 129.  This inconsistency, Churchill asserts, renders the Commission's order approving the Authority's funding proposal "not in accordance with law" and "in excess of statutory … authority."  5 U.S.C. § 706(2)(A), (C); *see* Amended Complaint ¶¶ 124–29.  Churchill thus asks the Court to "declar[e]" unlawful the Commission's order, along with any attempt the Authority might make to enforce it.  *See* ¶ 180(a)–(c).

Churchill is right that the statute enumerates only two factors—the Authority's "annual budget" and "the projected amount of covered racing starts"—on which assessments "shall … be based."  § 3052(f)(C)(ii).  Nowhere does the statute mention purses, which appear on the surface to have little if anything to do with the two enumerated considerations.  According to the Amended Complaint, the plain text settles it: the Authority may not calculate interstate assessments based on dynamic

9

purse sizes instead of a straightforward count of "covered racing starts." § 3052(f)(C)(ii)(I)(bb). When the Authority injected this "non-statutory criterion: the dollar value of the racing purses in each State," it exceeded the scope of its delegated authority and violated the statute. Amended Complaint ¶ 71.

Not so fast, answers the Authority: "based upon" does not, as a matter of statutory interpretation, mean "based *solely* on." HISA Motion to Dismiss at 15–16. The phrase instead must mean something like "'arising from,'" which "ordinarily refers to a 'starting point' or a 'foundation.'" *Id.* at 15 (quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111–12 (9th Cir. 2000)). Other courts confronting similarly unrestricted series, the Authority notes, have treated them as nonexclusive (albeit not open-ended, either). *See, e.g.*, *Bridgeport Hospital v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024). Additionally, it points to a negative implication of the Horseracing Act *itself*, which uses an "exclusive limitation" in a nearby provision. HISA Motion to Dismiss at 16 (citing 15 U.S.C. § 3054(g)(1)(B)).[13] If "Congress wishe[d] to impose exclusive limitations" here, the argument goes, it very well knew how to say so more clearly. *Id.*

Somewhat surprisingly, Churchill's opposition brief retreats from its prior position of express enumeration. Swapping Madisonian interpretive principles for a more malleable Hamiltonian view, Churchill now concedes that "based on" doesn't automatically mean "based solely on." *See* Churchill Response and Cross-MSJ at 13; *cf. McCulloch v. Maryland*, 4 Wheat. 316, 411–20 (1819) ("Necessary and Proper" laws may, at least in some circumstances, encompass measures that are necessary or proper, if not both).

This leaves Churchill's position much more exposed: conceding that the Authority's formula may in some circumstances rely on extratextual considerations besides starts and budget, it maintains that this Rule went too far. The purse-weighted methodology effectively "'abandon[ed]' or 'supplant[ed]'" starts—"the authorized scheme or decisional criteria." Churchill Response and Cross-MSJ at 13 (quoting *Bridgeport Hospital*, 108 F.4th at 887). With this retrenchment, all parties now agree that at least *some* unenumerated factors (perhaps even purses, if reasonably sized and weighted) could factor into the interstate assessment methodology—so long as the enumerated factors remain "the 'primary basis' for the regulator's action." *Id.* at 16 (quoting *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 44 (D.C. Cir. 2023)).

---

[13] That provision (as relevant) specifies that "[t]he Authority may issue guidance that … relates *solely* to" instructions such as "the administration of the Authority." 15 U.S.C. § 3054(g)(1)(B) (emphasis added).

How much is too much?  By focusing so narrowly on two words ("based on") and two statutory inputs ("budget" and "covered racing starts"), the parties pose quite a difficult question.  When does reliance on an extrastatutory factor cross over from the permissibly subsidiary to the impermissibly "primary" or "predominant"?  *Compare* Churchill Response and Cross-MSJ at 13, *with* HISA Reply at 7.  Incapable of direct answer, that question inevitably begets additional inquiries—many just as intractable as the last.  Does "predominant" change with the number of variables considered?  Does it matter whether those variables are also atextual?  Must a primary factor receive a majority of the agency's consideration, or just a plurality?  What if the formula is dynamic, treating a factor as dependent on other independent variables?  Surely all would agree that the mere mention of "starts" wouldn't automatically ensure the permissibility of a purse-dominated formula.  But then again, what linguistic principle would rule out consideration of other atextual factors—television ratings, betting handle, racetrack attendance, and the like?  What about other factors even more attenuated from the statutory text?  Is this any way to balance the scales with permissible and impermissible statutory criteria?  Or is "the scale analogy" even "appropriate, since the interests on both sides are incommensurate.  It is more like judging whether a particular line is longer than a particular rock is heavy."  *Bendix Autolite v. Midwesco Enterprises*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment).

This interpretive conundrum—on what factors may the Authority base its assessment formula, and to what extent—is ultimately insoluble as a semantic matter.  Yet it consumed the parties' briefs and dominated (*pre*dominated?) oral argument, despite the zealous efforts of skilled advocates.

At some point, the discussion moved from this Goldilocks fable to a math problem.  One might again wonder about the attenuation and utility of the parties' reliance on "interpretive aids" in the form of an algebraic equation:

$$\textit{State starts} \times \left\{ .5\left(\frac{\textit{national costs}}{\textit{national starts}}\right) + \left[ .5\left(\frac{\textit{national costs}}{\textit{national starts}}\right) \times \frac{\left(\frac{\textit{State purses for state starts}}{\textit{national purses for national starts}}\right)}{\left(\frac{\textit{State starts}}{\textit{national starts}}\right)} \right] \right\} = \textit{State fees}$$

HISA Motion to Dismiss at 8.

"[T]he proof" of a formula's lawfulness, Churchill's counsel insisted, "would be in the algebraic pudding."  Hearing Transcript at 45:15.  Churchill had "shown algebraically that [the purse variable] actually plays a very dramatic" and "predominant role" in the adopted interstate methodology.  *Id.* at 52:1–4.  *See also id.* at 38:13–17 ("About eight million comes from purses, four million comes from starts for Kentucky.").  The Authority's lawyer, unsurprisingly, solved the equation differently: "you don't have to be a mathematician" to "see that [the] starts-only

[variable] is two-thirds of the formula. That's what's driving" the overall methodology. *Id.* at 63:13–15. Any mathematical solution, of course, would necessarily depend on a given state's own purse sizes and start numbers. And those would in turn become a function of all *other* states' variables.

When did an abacus become an ordinary tool of statutory construction? And how can we fairly label as "interpretation" this how-much-is-too-much brand of analysis? If anything, it calls to mind the days when *Chevron* taught judges to defer to agency interpretations so long as they were "reasonable"—an inquiry often more similar to arbitrary-and-capriciousness review and sometimes susceptible to its own mathematical calculations. *See, e.g.*, *Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995) ("The *Chevron* analysis and the "arbitrary, capricious" inquiry … overlap in some circumstances…."). The Supreme Court, of course, has since erased this approach, in part because *Chevron* often raised difficult subsidiary questions having little to do with textual interpretation. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). To pick an example close to hand: the extent to which an agency's policy could depend upon extratextual considerations or the relative weights agencies assigned to enumerated statutory considerations, *see, e.g.*, *Mexican Gulf Fishing Co. v. United States Dep't of Commerce*, 60 F.4th 956, 966 (5th Cir. 2023) (agency "did not operate within the bounds of reasonable interpretation" in part because it failed to analyze "the costs to constitutionally protected privacy interests") (quotation marks omitted).

Eventually, a judge must depart the seminar room and return to the codebook, seeking an intelligible textual principle to connect the legislation and the adjudication. *See, e.g.*, Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J. L. & PUB. POL'Y 59, 63 (1988) ("To use an algebraic metaphor, law is like a vector. It has length as well as direction."). In this case, save for a late mention by FTC counsel, the parties nearly forgot the text had any direction to offer. But it does. What is a formula "based on" the budget and covered starts supposed to determine? The Act provides an answer: each "State's proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year." § 3052(f)(1)(C)(i)(I), (ii)(I).

This statutory goal has a profound and simplifying effect on the linguistic and mathematical jousting that has thus far characterized this lawsuit. May the Authority include extratextual considerations in a formula that remains based (at least somewhat) on starts and the HISA budget? That depends on whether those considerations relate to the state's share of the year's anti-doping and racetrack-safety program costs. The testing budget and number of starts that demand testing surely do. What about the relative size of the purses awarded to competing horses in a State's racing starts? Potentially—*if* the Commission can explain how a purse-based variable illuminates a given State's proportionate share of the tab for testing

12

and safety. *See Bridgeport Hospital*, 108 F.4th at 887 (agency's policy decision implementing a statute "must be anchored to" the statute's express command).

On this score, the Authority offers two theories: one rooted in tracks' "ability … to bear costs" and the other in a purported connection between purse sizes and testing costs. 87 Fed. Reg. 9350 n.13; *see* HISA Motion to Dismiss at 18 (citing FTC April 2022 Order at 10 & n.23). The latter is not necessarily "inconsistent with" the text of the Horseracing Act, but the former is.

A. <u>The interstate methodology's incorporation of equitable considerations was contrary to law.</u>

The Authority relies first and foremost on the notion that costs should be spread according to States' (and therefore tracks') "ability … to bear costs." 87 Fed. Reg. at 9350 n.13. Including a variable tied to purse sizes would advance "Congress's interest in 'proportionate' and 'equitabl[e]' fee allocations." HISA Motion to Dismiss at 18 (quoting 15 U.S.C. § 3052(f)(1)(C), (3)(B)).

This reasoning was the cornerstone of the Authority's proposal throughout the rulemaking process. Its initial proposed rule establishing the purse-weighted methodology parroted the statute, reiterating the statutory command "that the basis of the funding calculation is a State's proportionate share of 'the projected amount of covered racing starts for the year in each State.'" 87 Fed. Reg. at 9350 (quoting 15 U.S.C. § 3052(f)(1)(C)(ii)). But "[t]he Authority was not in favor of simply treating all racing starts in a given State uniformly as a 'covered racing start' because this would result in an inequitable allocation of costs." *Id.*

This conclusory assertion offers more questions than answers, given the statutory text. What is "an inequitable allocation of costs"? Equitable compared to or based on what, exactly? Not a State's proportionate share of testing and safety costs—but instead "the ability of Covered Persons to bear costs," which it presumed that "[h]igher purses greatly influence." *Id.* at 9350 n.13. According to the Authority, starts alone could not possibly determine States' proportionate share of costs. For "if all starts in all races at all tracks were treated equally, West Virginia would have a larger proportionate share than Kentucky, even though the purses and entry fees generated by the Kentucky races dwarf those generated by West Virginia races." *Id.*

But ability to pay has nothing to do with the proportional allocation Congress demanded. Who picks up the check is related to the size of the bill, as any free-rider knows, but the two are separate questions. And neither  addresses the critical separate question whether the size of a purse affects the cost of testing and safety. By assuming the authority to reallocate fees based on ability to pay rather than proportion of costs, the Authority thus departed from its statutory mandate in two respects. It conflated purse sizes with ability to pay, and it confused ability to pay

with responsibility for costs.  The temptation to tax based on wealth instead of consumption is a familiar one to policymakers and taxpayers alike.  But here Congress specified that assessments should rest on the Authority's cost inputs, not racetracks' price sensitivity.

Statutory context confirms this reading of § 3052(f)(1)(C)(ii).  The Authority points to statutory language invoking equity—but it cuts the opposite direction, because it appears in the *intra*state assessment provision found in a completely different part of the statute.  After Congress instructed the Authority to calculate each State's "proportionate share" of the budget "based on … starts for the year in each State," § 3052(f)(1)(C)(i)–(ii), it instructed the Authority to "allocate equitably" *each State's* total fee "among covered persons involved with covered horseraces," § 3052(f)(3)(B)—and only for those States that choose not to remit fees.  The intrastate-collection mandate has no bearing on the interstate proportionate-share mandate.  And the absence of any equity talk in subsection (f)(1), which concerns the interstate computation, belies the notion that Congress authorized the concept to creep elsewhere in this carefully reticulated statutory scheme.  *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up).

Nothing else in the statutory scheme indicates that Congress gave the Authority any redistributive power or leeway to subsidize States or tracks with smaller purse sizes by drawing more of its costs from higher-purse States.  And "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 395.  So the Authority's (and the Commission's) primary rationale fails as a matter of statutory interpretation, whatever its merits as a matter of economics or public policy.

B. <u>The interstate methodology's incorporation of purses as a proxy for expected program costs lies closer to the mark.</u>

Perhaps sensing this disconnect between costs and revenues, and therefore its equitable-allocation rule and the statutory text, the Authority reached for another theory.  Even if the Horseracing Act required it to allocate fees among the States based upon projected expenditures, it urges, the proposal it advanced satisfied this requirement because purse sizes can serve as proxies for testing costs.

Unlike the equitable-allocation theory, this one's at least textually plausible. As the Authority and Commission recognized, Congress gave them some leeway in designing an assessment scheme.  *See* 87 Fed. Reg. at 9350 & n.14 (observing that

14

Congress permitted the Authority "to establish by rule 'a formula or methodology for determining assessments'" and required "proportionality among States") (quoting § 3053(a)(11)); FTC Order at 10 (similar). Multiple metrics might quantify a "State's proportionate share" of the Authority's likely expenditures. § 3052(f)(1)(C)(i)(I). And nothing in the statutory text or structure definitively rules out reliance on an atextual factor that nevertheless serves as a useful heuristic for a state's proportionate share of those costs. At least not after Churchill's concession that "based on" doesn't mean "solely based on." Although Congress no doubt instructed the Authority to allocate costs proportionally, that high-level direction doesn't tell the Authority precisely what "proportionate" means—or how to calculate it. If purses served as a proxy for the Authority's projected expenditures within each State, in other words, that metric could be used to assess (or at least estimate) fees on a proportionate basis.

Does this use of unenumerated considerations still, as Churchill insists, assign them too much weight under the statute. That would bring us right back to the chalkboard. For better or worse, the Court needn't referee any more line-drawing games, however, because the Authority's use of purses as proxies fails for an equally fundamental reason: whatever linguistic connection may exist between it and the statute, it lacks any meaningful explanatory connection.

## II.    The Commission's Approval of the Authority's Assessment Methodology Was Arbitrary and Capricious.

This fallback explanation finds virtually no support in the evidence and explanation advanced by the Authority and Commission. As a textual matter, purses could conceivably help the Authority predict a "State's proportionate share" in the costs of HISA's testing and safety programs. § 3052(f)(1)(C)(i)(I), (ii)(I). But as a matter of predictive judgment, HISA rested its purse-proxy theory on nothing but unsupported, unexplained "anticipat[ion]." For that reason, it is arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law").

### A. "Purses as a proxy" received scant attention or explanation from the Authority during the rulemaking process.

Worth noting at the outset is the ancillary nature of this issue throughout the rulemaking process. The Authority consistently rested its inclusion of the purse variable on the ground that fairness and equity demanded extracting a larger share of costs from higher-revenue States.

Perhaps recognizing the vulnerability of its equitable-allocation theory under the statute, the Authority alluded to a second theory that might justify a state-by-

15

state allocation based on something other than starts. In the second sentence of the thirteenth footnote of the Authority's notice of proposed rulemaking, it intoned:

> It is also anticipated that stakes races and graded stakes races will have higher testing costs.

87 Fed. Reg. at 9350 n.13. And in this Court, the Authority strenuously argues that this predictive judgment adequately connects purse-weighting to proportionate costs.

But does it really? Several reasons—apparent on the face of the record—suggest not. First, and most notably, this snippet of the administrative record never mentions the word "purse" or purse sizes. Second, it fails to connect stakes races with higher purse sizes. Third, its use of the passive voice obscures who, exactly, anticipated these higher costs—not to mention why. Fourth, it's buried in a footnote and so short that a blinking reader might miss it. *Cf. SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("arguments raised in footnotes are not preserved"). Fifth, it offers an empirical judgment unsupported by any empirics—just the Authority's anecdotal expectation that higher-purse races would lead to more testing and disputes. Sixth, even assuming such an association existed, the Authority takes no steps to correlate its impact to that of the purse variable in the interstate methodology. And seventh, as the "also" suggests, the purse-as-proxy-for-testing-cost reason was a backup—even an afterthought—in the Authority's initial notice.

Perhaps the fleeting mention of testing costs insulates the Defendants from the charge that this is merely a "*post hoc* rationalizatio[n] for [their] action." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance*, 463 U.S. 29, 50 (1983). And when courts "judge the propriety of [agency] action solely by the grounds invoked by the agency," *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947), one good reason is ordinarily enough, *see Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290–91 & n.6 (1974). But the terse and tertiary recitation in the notice raises questions about "the disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). The paltry role the Authority's afterthought played in its decision "is incongruent," in other words, "with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

To be sure, as a matter of statutory interpretation, the gist of the Authority's explanation—that purse sizes could correlate with testing costs—might conceivably weave a purse-weighted funding formula together with States' "proportionate share of costs." § 3052(f)(1)(C)(i)(I), (ii)(I). But as a matter of administrative law, the actual explanation was far too thin a tether.

16

Congress instructed courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Administrative Procedure Act thus "requires [agencies] to engage in 'reasoned decisionmaking'" as they wield the "lawful authority" delegated to them. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998)). Within "the boundaries of delegated authority," Monaghan, *Marbury and the Administrative State*, 83 COLUM. L. REV. 1, 27 (1983), an agency's policy choices must "be reasonable and reasonably explained," *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Judicial review of those decisions "involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). In giving reasons, an agency must "examine the relevant data" and produce "a satisfactory explanation" allowing a court and regulated parties alike to assess how "the facts found" support "the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). *See, e.g.*, *F.E.R.C. v. Electric Power Supply Ass'n*, 577 U.S. 260, 295 (2016) (agency must "selec[t] a compensation formula with adequate support in the record, and intelligibly explai[n] the reasons for making that choice").

As described above, the Authority almost exclusively justified its purse-weighting budget assessment not on projections of what its programs might cost, but instead on the supposed need to allocate equitably *whatever* costs might arise. Yet just as this equitable-allocation reasoning bears no connection to the Authority's statutory mandate, it doesn't help ward off Churchill's arbitrary-and-capricious challenge. It is not among "the relevant factors" the Authority was supposed to consider—and therefore cannot support the purse-weighted methodology. *State Farm*, 463 U.S. at 42, 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.").

That leaves the Authority to hide behind the "conclusory statemen[t]" in Footnote 13 about the supposed correlation between purse sizes and testing costs. *Encino Motorcars*, 579 U.S. at 224. Even assuming this solitary sentence rang true, this line "do[es] not suffice to explain [the Authority's] decision." *Id.* To what degree do these phenomena correlate? What proportion of annual testing costs did the Authority expect would come from the relatively small number of stakes and graded stakes races? And even if purse sizes predicted states' proportionate shares of testing costs, what relationship exists between purse sizes and the cost of the racetrack safety program—the other aspect of the budget to which states' contributions must be "proportionate?" (This half of the statutory goal—allocating the "proportionate share of the horseracing anti-doping and medication control program *and the racetrack safety program*"—is entirely absent from the Commission's reasoning.

§ 3052(f)(1)(C)(i)(I), (ii)(I).)  Yet the Authority did nothing to explain (much less test) these conjectures.  Although commenters raised these concerns and more to the Authority's attention, it never supported its hypothesis—much less explained why that hypothesis would cohere with the rule it proposed.  *See, e.g.*, *State Farm*, 463 U.S. at 48 ("agency must cogently explain why it has exercised its discretion in a given manner"); *Arkansas-Best*, 419 U.S. at 286 (requiring that "agency's path may reasonably be discerned").

More fundamentally, the Authority offered no reason to think its footnoted alternative premise *was* true.  In litigation, but not in rulemaking, the Authority asserts that those facing disqualification in stakes races may "seek additional testing."  DN 61 at 9.  No commenters pressure-tested this theory—precisely because none saw it before it appeared in this Court.  So to accept the rationale HISA's counsel now advances, the Court would have to credit its unsupported "anticipat[ion]," standing alone.  "No record evidence suggests that" this prediction was correct. *Alaska Dep't of Environmental Conservation v. E.P.A.*, 540 U.S. 461, 498 (2004).  (In fact, the Authority now concedes it was wrong.)  And "[a]bsent evidence," it's hard to see the Authority's "cause for selecting" this assessment method over another.  *Id.* at 498–99.  *See also Tripoli Rocketry Ass'n v. A.T.F.*, 437 F.3d 75, 83 (D.C. Cir. 2006) (requiring "reasonable extrapolations from some reliable evidence," not "unsupported assertions" and "unstated inferences") (quotation marks omitted).

Defense counsel is of course quite right to insist that "[i]t is … permissible … for common sense and predictive judgments to be attributed to the expertise of an agency in an informal proceeding, even if not explicitly backed by information in the record."  *Phoenix Herpetological Society v. U.S. Fish & Wildlife Service*, 998 F.3d 999, 1006 (D.C. Cir. 2021).  So perhaps, in the right circumstances, a private corporation composed in part of industry representatives tasked with regulating their own companies and their competitors could intelligently guess where the costs of regulation might fall.

But uncertainty doesn't excuse an agency from reasoning.  Rather than incant the shibboleths of "uncertainty" and "prediction," agencies must "explain the evidence which is available," find what facts they can, and then—as usual—establish "a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43, 52 (quotation omitted).  An agency that "acknowledged the gaps in the data" could "rel[y] on the data it had (and the absence of any countervailing evidence) to predict" that its rule would produce the desired result.  *Prometheus Radio Project*, 592 U.S. at 425.  But an uninformed agency must own up to its knowledge problem— and then explain why the chosen rule is nevertheless a sensible response to, or in spite of, their empirical limitations.  *See, e.g.*, *American Textile Manufacturers Inst. v. Donozan*, 452 U.S. 490, 527–28 (1981); *Center for Auto Safety v. F.H.A.*, 956 F.2d 309, 315–16 (D.C. Cir. 1992); *Prairie Band*, 63 F.4th at 46–47.

In this case, by contrast, the Authority neither candidly confronted the problem of "insufficient data" nor explained why some empirical lacuna entitled it "to rely primarily on policy considerations rather than factual ones." *Center for Auto Safety*, 956 F.2d at 316.

And commenters offering "countervailing evidence" abounded. Commenters pointed out that nothing in their experience supported a correlation between purse sizes and testing costs. One group observed that "testing costs generally will scale with the number of racing starts, because each horse will need to be tested—and they will have little or nothing to do with purse value." Comment of Thoroughbred Horsemen's Ass'ns, et al., at 8. Another added that even if stakes races involved higher testing costs—which "no data … indicate[d]"—those races account for "only a small percentage of any state's starts." Comment of Fla. Horsemen's Benevolent & Protective Ass'n at 2–3. *See also* Comment of N.Y. Ass'n, et al., at 4–5 (similar). One might imagine that these concerns would've prompted the Authority to produce some data—or at least explain why none yet existed.

But the Authority "offered no reasoned response." *Ohio v. E.P.A.*, 603 U.S. 279, 293 (2024). Instead, it wrote a letter to the Commission that pulled its *Federal Register* footnote above the line: "It is also anticipated that stakes races and graded stakes races will have higher testing costs." Letter from John C. Roach, Counsel, Horseracing Integ. & Safety Auth., to April J. Tabor, Sec'y, Fed. Trade Comm'n, at 5 (Mar. 14, 2022). The Authority identified no additional data, but did offer a little more explanation: "[H]orses that compete in [stakes] races will be subjected to more vigorous out-of-competition testing, which is an expensive element of a vigorous drug testing program," and "it is anticipated that drug disqualifications in stakes races will result in higher enforcement costs" thanks to "protracted and costly litigation." Letter at 5 (citing a single Kentucky intermediate appellate decision). Nothing else addressed the commenters' central—and still unanswered—concerns. But "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) (*Munsingwear* vacated, 142 S. Ct. 1665).[14]

---

[14] Nor did the Authority contend with "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, that commenters raised for the first time. One commenter argued that accounting for purses would "penaliz[e] one racetrack to the benefit of another." Comment of Fla. Ass'n at 4. Another added that "linking a State's fee to its purse structure would create … significant negative ripple effects" by "encourag[ing] a State to run more races for lower purses" and "to distribute money outside of the purse structure"—both of which would endanger horses. Comment of Thoroughbred Ass'ns at 8.

B. The Commission abdicated its duty to check the Authority's work.

Even assuming it should've marshaled more evidence or explanation, the Authority responds, the Commission could bail it out.[15]  In the Authority's telling, the Commission could just "credit the Authority's expectations" about purse-weighting when the proposed rule came up for agency review.  HISA Motion to Dismiss at 19.  Is it really that easy for the Authority to launder its own arbitrary choices at the Commission?  *Delaware Dep't of Natural Resources & Environmental Control v. E.P.A.*, 785 F.3d 1, 16 (D.C. Cir. 2015) (Randolph, J.) (asking whether an agency may "excuse its inadequate responses by passing the entire issue off onto a different agency?").  Conversely, may the government so easily hand off its duty to "offer genuine justifications for important decisions" by outsourcing its reasoning to an industry group?  *Department of Commerce*, 588 U.S. at 785.  Is this really what the Sixth and Eighth Circuits had in mind when blessing the structural superintendence of HISA's public power under Article I?[16]

"Administrative law does not permit such a dodge," *Delaware Dep't of Natural Resources & Environmental Control*, 785 F.3d at 16, and courts have refused to convert "judicial review" into an "empty ritual," *Dep't of Commerce*, 588 U.S. at 785.  Instead, when Congress tasks an agency with reviewing proposals offered by self-regulatory organizations, the agency cannot merely take the organization's "word for it."  *Susquehanna International Group*, 866 F.3d at 447 (considering work of clearing agency subject to SEC oversight) ("[U]nquestioning reliance on OCC's defense of its own actions is not enough to justify approving the Plan.  Instead, the SEC should have critically reviewed OCC's analysis or performed its own.").  *See also Alliance for Fair Board Recruitment v. S.E.C.*, 125 F.4th 159, 179 (5th Cir. 2024) (*en banc*) ("SEC cannot approve a rule simply because an exchange declared the existence of some fact.  If it could, the statutory limitations on exchange authority would be dead letters.").

---

[15] If the Authority is an "agency" within the meaning of 5 U.S.C. § 551, then its action is subject to arbitrary-and-capricious review.  So unless the Commission's order expiated past sins, the assessment rule was unlawful.  On the other hand, if the Authority is *not* itself subject to APA review because it doesn't act as an "authority of the Government of the United States," § 551(1), then the strength of the Commission's reasoning is all the more important because that order marked the Government's sole opportunity to consider the proposal.

[16] If anything, it lends credence to the Fifth Circuit's concern that "arms-length review hardly subjects the Authority's rules to 'independent' oversight"—much less the "'pervasive surveillance and authority' an agency must exercise over a private entity."  *National Horsemen*, 53 F.4th at 884–85 (quoting *Sunshine Anthracite Coal v. Adkins*, 310 U.S. 381, 388 (1940)).

The Commission, however, somehow offered even less reasoning than the Authority. In defense of the proposal, the Commission offered only a single negative assertion, quoted from the Authority's notice of proposed rulemaking: "'The Authority was not in favor of simply treating all racing starts in a given State uniformly as a "covered racing start" because this would result in an inequitable allocation of costs.'" FTC April 2022 Order at 10 (Apr. 1, 2022) (quoting 87 Fed. Reg. at 9350). But a lawyer, no more than a horseman, can't beat something with nothing. This spare response to commenter critiques "had all the explanatory power of … Bartleby the Scrivener [responding] to his employer: 'I would prefer not to.' Which is to say, it provided no explanation" for why a purse-weighted methodology cohered with either the statute or the evidence. *Butte County v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010).

The Commission mimed not only the Authority's explanation, such as it is, but also its errors—tracking its reliance on equitable allocation rather than proportionate budgetary contributions. And like the Authority, the Commission relegated the reason on which the Defendants now rely to the second sentence of a footnote. *See* FTC Order at 10 n.23 ("'It is also anticipated that stakes races and graded stakes races will have higher testing costs.'") (quoting 87 Fed. Reg. at 9350). Indeed, the Commission's approval order is devoid of factfinding and policy reasoning alike. "[N]oting that there are likely multiple methodologies that the Authority could have proposed that would be consistent with the Act," *id.* at 20, the Commission abandoned any pretense of substantive review and instead rubberstamped the method the Authority happened to propose.

So even if the Commission's remove entitled it to defer to the Authority's reasons without thinking through them—and that's an awfully big "if"—that possibility wouldn't aid the Commission here. It appears not to have scrutinized the Authority's reasons or responded to reasoned criticism of the Authority's actions. The Commission approved the proposed rule for one principal reason: to the Commissioner's minds, the rule was "consistent with" the statute. Order at 1, 2, 3, 11, 18, 19, 20, 25. "Perhaps there is some explanation" for why the Commission thought the Authority was right to treat purse sizes as a proxy for testing costs. *Ohio*, 603 U.S. at 293–94 (2024). "But if there is an explanation, it does not appear in the final rule." *Id.*

\*

"*State Farm* does not require a word count." *American Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 248 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part and dissenting in part). Sometimes "a short explanation can be a reasoned explanation." *Id.* In this case, however, the Authority gave *no* explanation. Nothing supported its "anticipat[ion]" that purse sizes would correlate with testing costs. Nor did it explain why, even if purse sizes correlated with one element of the budget, that

21

fact would warrant allocating the *whole* budget based on purse sizes.  For its part, the Commission's reasoning amounted to one quotation of the Authority's reasoning. The agency thus offered even less explanation than the private corporation—and gives the Court no reason to suspect that it took a hard look at the proposed rule.

One might yet wonder: how did we reach a point where two distinguished bodies combined to offer so little in the way of reasoned decisionmaking?  The choice and evidence on the table concerned a major question for the horseracing industry and its new nationwide regulator.  Was this some version of a regulatory bystander effect?  Or is this evidence of some structural deficit in the scheme devised at such great legislative and litigation cost under the Horseracing Act?

Cursory review of this proposed rule may owe to the Commission's cramped interpretation of its statutorily prescribed role in Authority rulemaking.  Although the Horseracing Act purports to subject the Authority to "comprehensive oversight" by the Commission, *Oklahoma II*, 163 F.4th at 308, it gives effect to that role through a curious standard of review.  Rules proposed by the Authority take effect only if the Commission approves them—but the Horseracing Act provides that the Commission "shall approve a proposed rule … if the Commission finds" that it's "consistent with" the Act and any "applicable" Commission rules.  15 U.S.C. § 3053(c)(2).  Perhaps the Commission treats this as an exercise of independent decisionmaking, just as it would if it proposed the rule in the first place.  But the record here, at least, reflects a deferential *Chevron* mindset more than it does *Marbury*-style independent judgment. The Commissioners apparently took a narrow view of their role—repeating again and again in their order approving the Authority's proposal that Congress charged them only with confirming that the rule was "consistent with" the statute.  FTC April 2022 Order at 1, 2, 3, 11, 18, 19, 20, 25.  This may explain why the Commission refused to review the Authority's evidence and explanation—much less supply any of its own.

If so, this narrow approach to public oversight fits uneasily with the Sixth Circuit's decision rejecting the charge of excessive private delegation.  In *Oklahoma II*, the court of appeals read the Horseracing Act as requiring the Commission to "mak[e]" its own "policy choice[s] and necessarily scrutiniz[e] the Authority's proposed policy choices."  163 F.4th at 308–09 (citing § 3053(e)).  But Congress gave the Commission this independent authority only in 2022, after the Fifth Circuit had held that the "confined rulemaking role" given to the Commission under subsection (c), under which it had no authority to "question the Horseracing Authority's policy choices," worked an unconstitutional delegation of government power.  *See Oklahoma II*, 163 F.4th at 303 (describing this history) (quoting *Black I*, 53 F.4th at 872–73, 886–87).  The amended statute, however, withstood the Sixth Circuit's review.  Even if "the word 'consistency' … permit[s] the Horseracing Authority to obtain approval for proposed rules that contain embedded policy choices with which the FTC might disagree," "the FTC's authority [under subsection (e)] to modify *any* rules for *any*

22

reasonable reason at all, including policy disagreements, ensures that the FTC retains ultimate authority." *Id.* at 309. The Sixth Circuit expressed some doubt about the notion that "consistent with" so limited the Commission's review of proposed rules. *See id.*

This case, however, raises questions about whether the Commission shares the Sixth Circuit's robust view of that role. Certainly its pre-amendment orders—including the April 2022 order approving the assessment methodology—casts the Commission as almost a non-player character, not a lead . Which puts the agency in something of a bind. On one hand, if the statute required that it do no more than thin "consistency" review, then it's hard to call the Commission's approval orders arbitrary. They did just what the statute demanded—and any objections to that mandate sound in constitutional rather than administrative claims. On the other hand, it's hard to see why handing legislative and executive power to a private corporation subject only to passive rationality review *would* survive constitutional scrutiny. Escaping a constitutional Scylla might thus float the agency into the jaws of an administrative-law Charybdis.[17]

## III.  *Accardi*

Count 3 boldly ventures a different argument. Regardless of whether the purse-weighted methodology was unlawful from the start, the Authority's own regulations forbade it as of January 2023. This argument depends on a so-called "savings clause," *see* 87 Fed. Reg. at 67916—perhaps more aptly described as a fallback rule—proposed by the Authority in October 2022. The Commission adopted

---

[17] Perhaps sensing this problem, the Commission issued an order in January 2023 that responded to the amendment adding subsection (e). In that order, the Commission explained that it "now has a broader rulemaking power with respect to horseracing rules such that it can exercise its own policy choices whenever it determines that the Authority's proposals, even if consistent with the Act, are not the policies that the Commission thinks would be best for horseracing integrity or safety." Fed Trade Comm'n, Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Authority's Rules, at 3 (Jan. 3, 2023). Then the Commission purported to "ratif[y] its previous Orders," including the one "approving the Authority's proposed rul[e] on … Assessment Methodology." *Id.*

It's hard to see, of course, how this blunt statement could've cured the arbitrary-and-capricious problem before the Court in this case. The Commission's unreasoned *ex post* assertion that the assessment methodology (and every other old rule) made for good policy fares little better on that score than the Authority's unsupported prediction that purses would correlate with costs. But in any event, the Defendants forfeited any ratification argument by failing to so much as mention this ratifying rule in their briefing.

it in January 2023, shortly after the first funding rule took effect. *See* Amended Complaint ¶ 136. Responding to critical commenters, at least one recently filed lawsuit, and more anticipated litigation concerning the purse-weighted methodology, the Commission promulgated the savings-clause rule, which supplied a starts-only funding formula that would take effect if the purse-weighted methodology were enjoined. As Churchill framed the rule, "assessments of 'applicable States, Racetracks, and Covered Persons' will be based purely on starts if 'any court of competent jurisdiction issues an injunction that enjoins the enforcement" of the purse-weighted methodology. *Id.* (quoting 87 Fed. Reg. at 67919).

A "court of competent jurisdiction"—namely, the U.S. District Court for the Western District of Louisiana—*did* issue such an injunction. And it did so in July 2022, months *before* the Authority promulgated its savings clause. *See Louisiana*, 617 F. Supp. 3d at 502. As the parties have indicated, that injunction (covering Louisiana and West Virginia) has remained in place ever since (because the underlying case is stayed). *See* HISA Motion to Dismiss at 13; Hearing Transcript at 7:2–3.[18]

To Churchill, the fallback provision should apply to it (and presumably all other racetracks too). Because a court of competent jurisdiction has in fact "issue[d] an injunction that enjoins the enforcement" of the purse-weighted methodology, Churchill says the literal text of the savings clause mandates a starts-only formula here too. "It is arbitrary and capricious for the Authority not to apply its own rule here." Amended Complaint ¶ 136 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).[19]

---

[18] Counterintuitively, Louisiana and West Virginia are *not* currently subject to the savings clause because Judge Doughty's injunction bars the Authority from exercising *any* authority over races in these states. So although the purse-weighted methodology is not currently effective in these two states, neither is the fallback starts-only methodology— because those states currently lie outside the Authority's testing and safety program entirely. Hearing Transcript at 7:13–21 ("They're just not subject to the scheme at all.").

[19] Is the Authority an "agency" subject to the APA? The parties disagree about the applicability of black-letter administrative-law principles to this private, nonprofit corporation wielding public power. *See* HISA's Motion to Dismiss at 20–21; Churchill's Response and Cross-MSJ at 20. *See also* FTC Notice of Joinder in MTD (DN 52) at 2 (urging dismissal of Count 3 because Churchill doesn't challenge "any agency action [by the FTC] at all," given that the decision not to apply the savings clause was made by the Authority, not the Commission). Counts 1 and 2, by contrast, seek review of the *Commission's* adoption of the Authority's recommended purse-weighted methodology, which everyone agrees is subject to the APA. *See* Amended Complaint ¶¶ 129, 134. Because Count 3's unorthodox interpretation fails even if the APA applies to the Authority, answering this apparently novel

24

Churchill's interpretation of the Authority's regulation, however, is badly mistaken. That much is clear from reading the rest of the rule. Its text, omitted by Churchill, makes clear that the Authority didn't purport to implement a starts-based methodology for *all* regulated entities in the event of an injunction in favor of *any* regulated entity. Rather, the savings clause limits its effectiveness to parties subject to an injunction. "In the event that any court of competent jurisdiction issues an injunction that enjoins the enforcement of the Rule 8500 Series based on the use of Projected Purse Starts in the Assessment Methodology Rule, the *applicable* States, Racetracks, and Covered Persons, *as the case may be*, shall pay the [starts-only] allocation." 87 Fed. Reg. at 67919 (emphasis added). Churchill's reading would render these qualifiers superfluous; issuance of the injunction alone would trigger the fallback rule for *all* States and parties subject to the Authority's jurisdiction—not just the ones to whom the injunction was "applicable." Are the rule's phrases—"applicable States, Racetracks, and Covered Persons, as the case may be"—the most pellucid? No, not even by the standards of administrative lawyering. But among the plausible choices here, the Authority's limited interpretation of "applicable" to enjoined entities makes far more sense than Churchill's *all* "States [and] Racetracks" reading. Its effect would've been to invalidate the purse-weighted methodology for all parties immediately upon promulgation, since Judge Doughty had already ruled—a fact the Authority clearly was aware of in promulgating the fallback rule. The "consequences of adopting such a boundless reading … and the lack of any apparent need to do so in light of the context from which the [text] arose" lead the Court to conclude otherwise. *Bond v. United States*, 572 U.S. 844, 860 (2014).

The Rule, therefore, is far narrower than Churchill contends. It merely ensures that if the purse-weighted formula cannot be used to assess a subset of States, tracks, or covered persons, another (legally safer) formula based on starts would kick in—"as the case may be." 87 Fed. Reg. at 67919. The *Louisiana* decision thus triggered the savings clause *only* for the States of Louisiana and West Virginia, the plaintiffs benefitting from that injunction—not Churchill, which is not a party to that litigation.

## IV.    Equitable Estoppel Is Inappropriate Here.

Churchill Downs next pleads what it calls a federal-law "equitable estoppel claim." Amended Complaint ¶ 138; Response and Cross-MSJ at 21. On Churchill's telling, the Authority (more specifically, its CEO and codefendant, Lisa Lazarus) "misrepresented to CDI that it 'would be okay'" to pay assessments based on a starts-only formula—rather than the purse-weighted formula imposed by rule—"unless and

---

(and potentially quite important) question whether the APA applies to the Authority, acting alone, must await another case or controversy.

until" the *Louisiana* litigation concluded. Amended Complaint ¶ 140. For that reason, Churchill urges, the Court should "declare that Defendants are equitably estopped from enforcing [the] purse-based assessment methodology and should enjoin them from taking any action against CDI to enforce it." ¶ 143.

To the extent this claim runs against the FTC Defendants, it is doomed. The *government*, after all, "may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services*, 467 U.S. 51, 60 (1984). That is because "the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–09 (1917). As the Supreme Court has long recognized, "the Government could not be bound by the mistaken representations of an agent unless it were clear that the representations were within the scope of the agent's authority." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 419–20 (1990). And despite leaving the door cracked for decades, the Court has never confronted a "situation in which estoppel against the Government could be appropriate." *Id.* at 421. Consistent with this cautious approach, the Sixth Circuit has likewise ruled out government estoppel absent reason to think the government "either intentionally or recklessly misleads the claimant." *Michigan Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004).

The facts alleged here plainly won't create or stand for any such exception.[20] Nothing appears to connect the Commission to the Authority CEO's alleged comment about interim starts-based payments. That conversation with a private citizen, as described in Churchill's pleadings, carried few trappings of an official governmental pronouncement that might conceivably bind regulated and regulator alike—much less the "clear" ones that Supreme Court precedent requires, *Richmond*, 496 U.S. at 420.

To the extent this claim runs against the HISA Defendants, however, it raises a closer—and apparently novel—question. That is, whether a private organization wielding public authority is even subject to estoppel. To be sure, the Authority is not the government—at least not exactly. It is instead a curious amalgam—a private corporation wielding the (supervised) power to make and enforce rules with the force of law. Although years of litigation have seemingly settled the constitutionality of the Authority's hybrid structure, *see Oklahoma II*, 163 F.4th at 307–16, questions

---

[20] Admittedly, in the context of preclusion, a judgment that binds a private party authorized to represent the United States likewise binds the government. *Adkins*, 310 U.S. at 402–03. It's telling, however, that the Court has never extended this principle to the informal, out-of-court estoppel on which Churchill relies.

remain about the public-law implications of its nearly-novel status. *See* above n.<mark>x</mark> (questioning whether the Authority is an "agency" within the meaning of the APA). At least some authority suggests that even when "[t]he Government … carr[ies] on its operations … through corporate forms especially created for defined ends," regulated parties cannot reasonably expect to hold agents to their later-overruled words: "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384 (1947).

But even if the Authority's private features subjected it to the prospect of estoppel claims, its status would still raise questions about its (ahem) authority under the law of agency. That is, whether the Authority is "clear[ly] … authori[zed]" to make "representations" on the government's behalf. *Richmond*, 496 U.S. at 419–20. And Churchill has made no effort to demonstrate that the HISA CEO was speaking on behalf of the FTC when she (allegedly) pledged enforcement forbearance.

Meanwhile, the prospect that Authority employees or board members could estop the Authority—as opposed to the Commission—raises more elementary concerns about whether Churchill can and has alleged "(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010) (quotation marks omitted). Churchill offers no reason to doubt that when the Authority agreed to accept reduced payments during the *Louisiana* litigation, it intended to honor that accord—just as both parties expected the litigation to conclude quickly. But when *Louisiana* dragged on into its fourth year, mired in an indefinite stay, that agreement became untenable. Yet Churchill offers no reason to think the Authority concealed or distorted some then-existing fact or intention. Neither does Churchill explain how it detrimentally relied on the temporary détente it had with its regulator. To the contrary, as Churchill explains, it "has declined to remit to the Authority the full amount of the fees … demanded" because Churchill believes the assessment methodology is "unlawful." Amended Complaint ¶ 112.

To the extent Churchill Downs appeals to this Court's equitable discretion to order estoppel and enjoin the Commission, moreover, the Court would decline to exercise its "considerable discretion" based on "the facts of [the] situation" and the "public interest." *eBay v. MercExchange*, 547 U.S. 388, 391, 394 (2006) (citation omitted). The Authority not only makes the law governing horseracing, but enforces it. 15 U.S.C. §§ 3054(j), 3057(d). Forbidding it (or the Commission) to do so based on the representations of Authority employees or board members could have similar effects as directly estopping federal law enforcement. At least when it comes to *this* statement by an employee of *this* quasi-public agency, an injunction estopping the

Authority from exercising its own congressionally delegated enforcement discretion would be a poor use of this Court's equitable discretion.

All to say, Churchill hasn't plausibly alleged that it's *worse* off than it would be had the Authority immediately demanded and collected the full fee, and thus fails to plead the elements of estoppel against an ordinary litigant. *Premo*, 599 F.3d at 547.[21] And it falls shorter still when it comes to pleading the affirmative misconduct needed to warrant estoppel against the government Defendants. Those pleading failures, along with the Court's concerns about the unusual discretionary relief Churchill seeks, are reason enough to dismiss Count 4 of the amended complaint.

Churchill's equitable "claim" raises still more concerns, however, even independent of the structural concerns and pleading problems described above. Typically, equitable estoppel doesn't function as "a cause of action," but instead as "a judicial doctrine that bars the assertion of a claim or defense." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 n.1 (6th Cir. 2009). Despite some loose language about "claims" in several opinions, every data point cited by Churchill Downs fits the estoppel-as-defense regression. *See, e.g.*, *Premo*, 599 F.3d at 547 (using the word "claim" to describe a plaintiff's response to a defense asserted by the government in FTCA litigation); *Michigan Express*, 374 F.3d at 427 (eschewing the word "claim" but applying the doctrine in the same way). To be sure, Churchill might assert estoppel as a *defense* in an enforcement proceeding—or perhaps even win a preenforcement declaration or decree under ordinary discretionary standards. But Churchill cites no authority for its assumption that it may demand a preenforcement decree merely by pleading the "elements" of an estoppel defense, untethered to the federal statutes endowing and limiting courts' equitable authority.[22] For this reason, Count 4 comes

---

[21] Unable to identify any financial detriment incurred thanks to the Authority's supposed misrepresentation, Churchill counters that without the Authority's statements, it "would have brought its own suit … challenging the legality of the purse-based methodology." MSJ at 22. But even assuming that is true, and that the lack of a lawsuit is a cognizable injury, Churchill never explains how the relief it requests—an injunction forbidding the Authority to collect fees until the *Louisiana* litigation concludes—would redress that injury. Churchill's promised lawsuit has already begun. The Court cannot wind back the clock.

[22] *See Trump v. CASA*, 606 U.S. 831, 841–42 (2025) (equity power conferred by the First Judiciary Act is limited to remedies "analogous to the relief issued by the High Court of Chancery in England at the time of the adoption of the Constitution") (quotation marks omitted); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (directing judges asked to enter declarations to weigh "the propriety of declaratory relief in a particular case") (quotation marks omitted). *See also United States v. Louisville Jefferson County Metro Gov't*, No. 3:24-cv-722, 2025 WL 238010, at *2–3 (W.D. Ky. Jan. 18, 2025).

short of stating a claim for the sort of relief Churchill seeks in this posture—even if Churchill plausibly alleged each "element" of this "claim," MSJ at 23.

## V.    Churchill Downs Identifies No Quasi-Contract.

Churchill's "quasi-contract" claim fares no better.  Count Five asks the Court to prevent the Defendants from seeking any unpaid fees thanks to "a legal fiction" that "promises were made"—even though the parties never reached a formal agreement.  Amended Complaint ¶ 145 (quoting *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987)).

For centuries, "the gist of this kind of action" has been "that the defendant … is obliged by the ties of natural justice and equity to refund" some money unjustly retained.  *Moses v. Macferlan* (1706) 97 Eng. Rep. 676, 681 (K.B.).  "Quasi-contracts," scholars have explained, rest "upon the fundamental principle of justice that no one ought unjustly to enrich himself at the expense of another."  Ames, *History of Assumpsit*, 2 HARV. L. REV. 53, 64 (1888).  Kentucky continues to recognize such claims today.  Parties who never technically formed contracts, but who engaged in some form of exchange, may pursue "compensat[ion] for an unjust act, whether it is harm done to a person after services are rendered, or a benefit is conferred without proper reimbursement."  *Normandy Farm, LLC v. Kenneth McPeek Racing Stable, Inc.*, 701 S.W.3d 129, 143 (Ky. 2024) (citation omitted).

This sort of claim has long traveled under different names—"quasi-contract," "restitution," or "unjust enrichment."  But whatever the label, all depended on one "common feature": "that the defendant has received money or property that ought in justice to be made over to the plaintiff."  DAVID IBBETSON, A HISTORICAL INTRODUCTION TO THE LAW OF OBLIGATIONS 264 (1999).  This is a requirement of both pleading and proof.  A plaintiff must establish that although "neither the words nor conduct of a party are promissory in form or justify any inference of a promise," the defendant bore some "obligation imposed by law as an enforceable duty, without mutual assent, for the purpose of affording a remedy or the right of recovery where money or property or services were received under such circumstances that in equity and good conscience the recipient ought to pay for them."  *Thompson v. Hunter's Executor*, 269 S.W.2d 266, 269 (Ky. 1954).  And a successful claim corresponds to the typical quasi-contract remedy: restitution of the defendant's ill-gotten gains.  *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION § 4 cmt. *d* ("The standard legal remedy for a liability based on unjust enrichment is a judgment for money.").

Churchill's claim deviates from this fundamental restitutionary principle.  It doesn't contend that the Authority has been unjustly enriched.  Nor could it.  On Churchill's telling, the Authority's gratuitous deferral led Churchill to pay *less* than it otherwise would've.  Its own allegations therefore appear to rule out any conventional quasi-contract claim, because Churchill apparently never let go of any

disputed funds.  So if anyone has a restitutionary argument, it might well be HISA—which shelled out for testing costs while Churchill paid less than every other track in the country.

If Churchill's exotic extension of quasi-contract were to prevail, some sort of "implied-in-law obligation" not to "brin[g] an enforcement action" might be the odd doctrinal innovation.  Amended Complaint ¶ 151.  Which sounds a lot more like estoppel than restitution.  Although, to be fair, some Kentucky decisions describe quasi-contract as rooted in "the conduct of the parties" *or* the prospect of "unjus[t] enrich[ment]." *Kentucky Association of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 633 (Ky. 2005); *cf. Fayette Tobacco Warehouse Co. v. Lexington Tobacco Board of Trade*, 299 S.W.2d 640, 643–44 (Ky. 1956).  Churchill places great weight on this disjunctive formulation, positing that all or many instances of "conduct" perceived as unjust might give rise to quasi-contract claims.  Motion at 23, 25.  But whether the law speaks in terms of "the conduct of the parties" or instead "unjust enrichment," what really matters is the unjust retention of a benefit—as has been the case for centuries.  Indeed, every decision that Churchill cites recognizes that a quasi-contract claim turns on whether the defendant unfairly retained a benefit from the plaintiff.  *See, e.g.*, *McClendon*, 157 S.W.3d at 633 (judges keeping money); *Fayette Tobacco Warehouse*, 299 S.W.2d at 643–44 (association members enjoying the appurtenances of office); *Perkins*, 722 S.W.2d at 909 (property owner receiving "engineering services").

Yet Churchill identifies no benefit—monetary or otherwise—that the Authority has kept at Churchill's expense or detriment.  Nor has Churchill explained how it has incurred any corresponding loss during its three-year period of reduced payments.  This begins to look just like estoppel dressed up in civilian clothes.  And just as it's hard to see how these facts would support equitable estoppel, it's hard to see how an enforcement lawsuit—long threatened, recently begun, and now apparently partially settled, *see* DN 75—is the sort of problem for which Churchill might get restitution.[23]

Churchill Downs counters, relying on a 1956 decision of Kentucky's high court, that "a bill in equity … might be the appropriate means of enforcing some obligation implied in law."  MSJ at 24 (quoting *Fayette Tobacco*, 299 S.W.2d at 644).  But although this old Kentucky precedent seemingly permits courts recognizing "quasi contracts" to "restore the plaintiff to a former status," *id.*, *Fayette Tobacco* neither recognizes nor creates a freewheeling equitable authority to spot injustice and redress it with the specific relief of an injunction.  In allowing that specific *remedies* could

---

[23] Or perhaps a declaration?  Churchill's remedial request remains hazy at best.  What sort of restitution it imagines is not evident as a matter of pleading or logic.

redress quasi-contractual injuries, the court never questioned that the plaintiff's claim on the *merits* depended upon having given the defendant a benefit.  *See id.* Without identifying any benefit that it conferred on the Authority, Churchill Downs fails to state a quasi-contract claim—for any kind of relief.

## REMEDIES & ORDER

Although Churchill's common-law claims fail, its APA claims succeed in part: the Authority's purse-weighted methodology is contrary to law to the extent it is "based on" a State's tracks' perceived ability to pay the assessments and arbitrary and capricious to the extent it rests on relatively higher purses as a proxy for the State's proportionate share of testing costs under the Horseracing Act.  The purse-weighted formula set forth in the Commission's 2022, 2023, and 2024 therefore may not be enforced against Churchill.

The Court accordingly grants in part the Authority's motion to dismiss (DN 48) with respect to Counts 3, 4, and 5 of the amended complaint.  The Court also grants in part Churchill's motion for partial summary judgment (DN 58) and enters declaratory judgment in its favor.

As to Churchill's request for an injunction forbidding the Authority and Commission not to enforce these funding rules against it, *see* Amended Complaint ¶ 180(j), the Court sees neither a factual need nor a legal basis for that remedy at this stage.  During the hearing on these motions, both parties agreed that the proper relief if the Court sided with Churchill would be the "declaration about the meaning of the statute and the lawfulness of [the Defendants'] purse-based methodology." Hearing Transcript at 11:14–16 (Churchill's counsel); *accord id.* at 13:2–6 (HISA's counsel).  And in any event, given the record before the Court and the history of this and the related litigation, the Court sees no reason to think Churchill satisfies "the traditional four-factor framework that governs the award of injunctive relief." *eBay*, 547 U.S. at 394.  The classic monetary harms Churchill describes counsel against finding that it suffered an irreparable injury for which legal remedies "are inadequate to compensate," *id.* at 391, and the "balance of hardships" and "public interest" give the Court pause, *id.*, considering that as of January 1, 2026, the Authority and Commission ceased using the purse-weighted formula.  For now, then—and seemingly with the parties' blessing—the Court declines to afford this "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982) ("a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law" and must "pay particular regard for the public consequences in employing" injunctions).  Notably, Churchill has not yet moved for emergency or interim relief, though the parties' filings have alluded to that prospect.  *See* Letter Br. from Thomas Dupree & Pratik Shah (DN 75) ("We write to let you know that there will be no need for TRO litigation.").  If Churchill wishes in the future to argue that

"[f]urther necessary or proper relief based on [this] declaratory judgment" would be appropriate, 28 U.S.C. § 2202, it may so move.

Churchill Downs does not ask that the Court vacate any of the Commission's orders. Even if it did, moreover, the Court finds that declaratory relief "represent[s] a more tailored and appropriate remedy," *Kentucky v. Federal Highway Administration*, 728 F. Supp. 3d 501, 523 (W.D. Ky.), given that the purse-weighted methodology is no longer in effect for the current funding cycle and nothing indicates any likelihood that it'll reemerge.

## Declaratory Judgment

Under 28 U.S.C. § 2201, the Court declares:

1. Insofar as the Commission's funding-rule approval orders of April 2022, January 2023, and December 2024 depended upon, incorporated, or extended the purse-weighted methodology, these orders are arbitrary and capricious, and therefore unlawful.

2. Efforts by the Defendants to enforce these orders against the Plaintiffs—including by collecting fees attributable exclusively to the purse-weighted methodology—are unlawful for the same reason.